Gerald Eugene STANO, Petitioner–
Appellant,

v.

Robert A. BUTTERWORTH, Harry K. Singletary, Respondents–Appellees.

Nos. 92–2812, 92–3052 and 93–3269.

United States Court of Appeals,
Eleventh Circuit.

April 20, 1995.

* Judge Rosemary Barkett has recused herself and will not participate.

Mark Evan Olive, Tallahassee, FL, for appellant.

Margene A. Roper, Asst. Atty. Gen., Office of the Atty. Gen., Dept. of Legal Affairs, Daytona Beach, FL, for appellees.

Before ANDERSON, EDMONDSON and CARNES, Circuit Judges.

CARNES, Circuit Judge:

Gerald Eugene Stano was convicted and sentenced to death in 1983 for the 1974 murder of Cathy Scharf. The lengthy factual and procedural history of this case is set out in our previous en banc and panel opinions. *See Stano v. Dugger,* 901 F.2d 898 (11th Cir.1990) (en banc); *Stano v. Dugger,* 883 F.2d 900 (11th Cir.1989). In that en banc opinion, we remanded the case to the district court for an evidentiary hearing on specified issues. The district court conducted a hearing that lasted ten days. We are indebted to that court for the thoroughness with which it explored the relevant factual issues and for

its meticulous findings of fact. A copy of the district court's order, containing its factfindings, is reproduced as Appendix A hereto.

After the district court had issued its order on remand but before the case had been briefed to this Court, Stano filed a Fed. R.Civ.P. 60(b) motion raising additional but related issues. The district court's order denying that motion is reproduced as Appendix B hereto.

Stano appeals from the district court's adverse rulings on the issues we remanded to it, and he also appeals from the court's denial of his Rule 60(b) motion. We consolidated the two appeals, and for the reasons that follow we affirm the denial of relief in each.

## I. STANDARD OF REVIEW

Initially, we address Stano's assertion that the clearly erroneous standard of review does not apply to the district court's findings of fact. In support of his contention, Stano cites a portion of our opinion in *Jurek v. Estelle*, 623 F.2d 929 (5th Cir.1980), *cert. denied*, 450 U.S. 1001 & 1014, 101 S.Ct. 1709 & 1724, 68 L.Ed.2d 203 & 214 (1981), in which we state, "In passing on the ultimate issue of voluntariness, we may substitute our own judgment even in the absence of a conclusion that the district court's ruling was clearly erroneous." *Id.* at 932. Stano misreads our precedent and misapprehends the limited nature of our review of factfindings. It is clear from the statement itself and certainly from the context of the discussion in *Jurek* that the statement Stano relies upon was referring to the "ultimate" determination of the voluntariness of a confession, a mixed question of law and fact that is subject to *de novo* review. *See id.* Indeed, just before the sentence quoted by Stano, we stated that "We will not disregard or overturn findings of fact made by the district court unless they are clearly erroneous." *Id.*

The Supreme Court subsequently clarified the meaning of the clearly erroneous standard of review of a district court's findings of fact in *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), where it held:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.* at 573–74, 105 S.Ct. at 1511; *see also Spaziano v. Singletary*, 36 F.3d 1028, 1032 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 911, 130 L.Ed.2d 793 (1995).

Stano also cites the *Jurek* opinion for the proposition that we will not defer to the district court's factfindings based on documentary evidence where those findings do not rest upon credibility evaluations of live witnesses. That is what we held in *Jurek*, 623 F.2d at 932, but it is no longer good law. Five years after *Jurek*, the Supreme Court in *Anderson* squarely held that the clearly erroneous standard of review applies "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." 470 U.S. at 574, 105 S.Ct. at 1511–12; *see also Spaziano*, 36 F.3d at 1032.

Accordingly, we apply the clearly erroneous standard of review to the district court's factfindings—whether those findings are based on witness testimony or on documentary evidence. Moreover, as mandated by the Supreme Court, we will give even "greater deference" to factfindings of the district court that are based on determinations of the credibility of witnesses, as is largely the case here. *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512.

As to the denial of Stano's Rule 60(b) motion, this Court "will overturn a district court's denial of a motion to set aside a judgment pursuant to Fed.R.Civ.P. 60(b) only if the district court has abused its discretion." *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1545 n. 21 (11th Cir.1991).

## II. DISCUSSION

We will first address Stano's appeal from the district court's denial of habeas relief following its evidentiary hearing on the issues remanded by this Court's en banc opinion. Then we will discuss his appeal from the district court's denial of his Rule 60(b) motion.

### A. THE REMAND ISSUES

The en banc opinion of this Court remanded four issues to the district court, each of which we will address in turn.

### 1. The *Brady* Claim

■ As stated in the en banc opinion, "Stano has alleged that the prosecution suppressed evidence that there was collusion between [Sergeant Paul] Crow, the police investigator; Donald Jacobson, Stano's defense attorney during the investigative stage; and Dr. Ann McMillan, the defense psychologist during the investigative stage. The alleged purpose of this collusion was to exploit Stano's mental vulnerabilities in order to coerce murder confessions, including confessions to the Scharf killing." 901 F.2d at 899.

The district court made the following findings of fact based on the evidence adduced at the evidentiary hearing: Attorney Jacobson did not tell Crow what Stano had confessed to him until Stano entered his plea agreement with the State's Attorney's Office in the Seventh Judicial Circuit of Florida (consisting of Volusia, Flagler, Putnam, and St. Johns Counties). Crow did not ask Jacobson or Warren Walker, an investigator for the defense, for details about any murders or request that they ask Stano for any details. Stano and his parents encouraged Jacobson to obtain a plea agreement for Stano that would avoid a sentence of death. Because Jacobson knew that Stano had committed multiple murders, he arranged a plea agreement with the Seventh Judicial Circuit prosecutor that would prevent Stano from receiving the death penalty for any murders to which he confessed before a plea of guilty was entered and in which the victim's body was found within the jurisdiction of the Seventh Judicial Circuit. Jacobson permitted Crow to talk to Stano about murders within the scope of the plea agreement in order to comply with the agreement. Jacobson told Stano that he should confess to all the murders in which he left the bodies of the victims within the Seventh Judicial Circuit, because any murders revealed after the plea of guilty was entered would not be covered by the plea agreement and could result in a death sentence. Moreover, Jacobson explained to Stano that because the plea agreement was limited to the Seventh Judicial Circuit, Stano was not to talk about any murders in which a body was left outside that jurisdiction—which would include the murder of Cathy Scharf in Brevard County.

The district court also found that Dr. McMillan did not instruct Crow about how to question Stano, or even talk with Crow about his methods of interrogation, and that there was no evidence that any statements made by Dr. McMillan influenced Crow's method of interrogating Stano. Crow did not receive a "covert" copy of a July 12, 1992, letter from Jacobson to Stano. Jacobson did not reveal information he had learned from Stano concerning homicides committed outside the Seventh Judicial Circuit beyond the six murders within the scope of the plea agreement and the September 2, 1981, plea of guilty. Crow did not deprive others of contact with Stano. Crow had no intention of writing a book while his investigation of Stano was ongoing, and Crow did not "feed" information to Stano in order to cause Stano to confess to homicides that he did not commit.

Based upon our review of the record, we hold that the district court's factfindings, which we have summarized in the preceding two paragraphs, are not clearly erroneous. Those findings fully support, indeed compel, the district court's conclusion that "there was no collusion between Crow, Jacobson and McMillan." That alone is a sufficient basis upon which to affirm the district court's rejection of Stano's *Brady* claim, because there cannot have been suppression of nonexistent evidence.

The district court went further and held, as an alternative basis for rejecting the *Brady* claim, that Sergeant Crow, who was a member of the Daytona Beach Police De-

partment in Volusia County, was not part of the Brevard County prosecution team that prosecuted Stano for the Scharf murder. That holding was based upon factfindings that: Crow did not do any investigation for Dean Moxley, the Brevard County prosecutor in the Scharf case; Crow was not under Moxley's authority or control; Crow did not participate in developing Moxley's case for trial; there was no jurisdictional overlap between Brevard County and either Volusia County or the Daytona Beach Police Department regarding the control or direction of the Scharf murder investigation; Crow was used by Moxley merely as a fact witness and source of information for the Scharf investigation; and the Scharf case "was always a Brevard County Sheriff's case and never a joint investigation with any other agency."

Our review of the record convinces us that the district court's factfindings about Crow's relationship to the Scharf murder prosecution team are not clearly erroneous, and thus the factual premise of its alternative holding is sound. The legal premise of the alternative holding is that information known to a police officer who testifies at trial is not imputed to the prosecutor in a different jurisdiction unless that officer is a member of the prosecution team. That may be so, see Stano, 901 F.2d at 906–07 (Edmondson, J., concurring), but we need not decide, because it is enough for present purposes that there was no collusion and thus no suppressed evidence. We affirm on that basis without addressing whether, if there had been collusion, Crow's knowledge of it would have been imputed to the prosecution.

## 2. The *Henry* Claim

■ Stano has alleged that the trial testimony of Clarence Zacke, a jailhouse informant, was in violation of *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). The district court found no evidentiary support for Stano's *Henry* claim and made the following factfindings:

In the present case, there was no evidence that Zacke received instructions from the police, from the prosecutors, or from anyone else to do anything whatsoever concerning Stano. There was nothing in the evidence presented to the Court indicating that there was any prearrangement for Zacke to obtain anything from Stano. The Court was presented with no evidence indicating that Zacke was paid or otherwise rewarded to develop any type of relationship with Stano or to otherwise secure incriminating information. The prosecution did not use Zacke to carry out any deliberate and surreptitious interrogation of Stano. Zacke was not promised any rewards for any information that he might provide regarding Stano. The prosecution did not request Zacke to elicit any information from Stano, and there was no presolicitation of Zacke by the prosecution to do anything of any nature concerning Stano. There simply was no evidence that Zacke was a government agent or that Zacke in any manner deliberately elicited incriminating statements from Stano.

Based on our review of the record, the district court's findings are not clearly erroneous. Accordingly, we affirm the denial of habeas relief based on the *Henry* claim.[1]

## 3. The *Johnson v. Mississippi* Claim

■ In our en banc opinion, we also asked the district court to address Stano's argument that his sentence should be vacated under *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), because two of the convictions relied upon in his sentencing had been invalidated by a panel of this Court.[2] *Stano*, 901 F.2d at 905. However, the opinion invalidating those two convictions, *Stano v. Dugger*, 889 F.2d 962 (11th Cir.1989), was subsequently vacated, *Stano v. Dugger*, 897 F.2d 1067 (11th Cir. 1990), and the case heard by this Court en banc. As the district court correctly observed, the en banc Court determined that Stano's Sixth Amendment attacks on the two

---

1. Because we reject Stano's challenge on the merits, we need not decide whether the *Henry* claim was procedurally barred. *See Stano*, 901 F.2d at 905.

2. The two convictions were for the murders of Susan Bickrest and Mary Kathleen Muldoon. *Stano v. Dugger*, 889 F.2d 962, 963 (11th Cir. 1989).

convictions were without merit and affirmed the district court's denial of habeas corpus relief as to those convictions. *Stano v. Dugger,* 921 F.2d 1125, 1154 (11th Cir.), *cert. denied,* 502 U.S. 835, 112 S.Ct. 116, 116 L.Ed.2d 85 (1991). Because the panel opinion invalidating the two convictions has subsequently been overturned by this Court en banc, we hold that Stano's *Johnson v. Mississippi* claim was properly rejected.

#### 4. Voluntariness of Stano's Confessions

■ Although there is some question as to whether our en banc opinion specifically directed the district court to determine whether Stano's confessions to the Scharf murder were voluntary, the evidentiary hearing did include this issue and the district court made findings of fact and entered a holding concerning it. Regarding the March 1981 confession, the district court found that Stano waived his rights after being advised of them and that neither Crow nor the other questioner coached Stano or edited the tape recording of the interview. As for the August 1982 confessions, the court found that Stano waived his rights and that there was no evidence that the waiver of rights form was filled out before it was given to Stano.[3] The court also dismissed the testimony of Martin Markowitz, who suggested that tapes of Stano's interviews indicated his responses were coerced or involuntary, as "speculative, unreliable and beyond the competency of this witness...." The district court determined that "there was no coercion imposed by Crow, Jacobson, or McMillan, together or individually, on Stano with regard to the confessions" and rejected Stano's claim to the contrary. After reviewing the record, we agree with the district court.

#### B. STANO'S RULE 60(B) MOTION

The district court conducted its evidentiary hearing in January and March of 1992 and issued its order denying relief on June 10, 1992. In June of 1993, a book entitled *Blind Fury* was published. *Blind Fury* was writ-ten by the mother of an Assistant Florida Attorney General who had participated in the litigation of this case, and includes a forward written by Sergeant Crow. It is a paperback, tabloid-type book which purports to chronicle the investigation of Stano and his murder convictions. As the State aptly observed in its brief, *Blind Fury* is "obviously without a scholarly bent" and "has the intellectual appeal of a mosquito bite." The book does contain numerous references to Crow, and Stano contends that it "was written with Paul Crow's substantial assistance and active participation."

■ Stano moved for relief from judgment under Fed.R.Civ.P. 60(b) based on the publication of *Blind Fury.* In his motion to the district court, Stano argued that the publication of the book undermined the credibility of Sergeant Crow, that it provided substantive support for Stano's constitutional claims, and that the attorney general's office improperly failed to disclose the fact that the book was being written. The district court denied Stano's Rule 60(b) motion, finding that Stano's allegations did not justify relief from its earlier order denying habeas relief. Stano contends that the district court should have held an evidentiary hearing regarding the impact of *Blind Fury* on the district court's assessment of Crow's credibility. For the reasons that follow, we reject Stano's contention and affirm the order of the district court denying his Rule 60(b) motion.

Stano argues that Crow's participation in the publication of *Blind Fury* undermines the credibility of his testimony at the evidentiary hearing where he stated that he was not involved in writing a book about Stano and that he was only interested in authoring an educational treatise for use by law enforcement. The district court rejected Stano's assertion that the subsequent publication of *Blind Fury* should change its evaluation of Crow's credibility and the substance of his testimony. The district court noted that Crow testified at the hearing that he did

---

3. There was some dispute at the evidentiary hearing about whether the transcript of Stano's August 12, 1982, interview had been deliberately altered by Stano's habeas counsel to substitute Crow as the questioner instead of Detective Man-is. After exploring this matter at oral argument, we are satisfied that the alteration was not done deliberately and that Stano's counsel is not guilty of any misconduct in relation to the transcript.

not want to write a book until the Stano investigation was over, and that the investigation had been concluded. Moreover, Crow did not author the book; he only wrote the forward and assisted the author. The court determined that there was no "reason why Mr. Crow would now be foreclosed from authoring a book of his own."

We agree with the district court that the issue of whether Crow's investigation and testimony was tainted by his desire to write a book was "thoroughly explored" at the evidentiary hearing held before *Blind Fury* was published, and that Stano's allegations "demonstrate no facts which would undermine the previous findings of the Court." The publication of *Blind Fury* in 1993 does not demonstrate that Crow was motivated in 1981 and 1982 by ulterior motives to coerce Stano to make confessions to crimes that he did not commit. In addition, the fact that the book was published (a year and a half after he testified) does not undermine Crow's credibility at the hearing; the same district court judge whose job it was to evaluate the credibility of witnesses at the evidentiary hearing has explicitly determined that publication of the book does not affect his credibility assessments. We therefore hold that the district court was not required to hold an evidentiary hearing regarding the book *Blind Fury* and that the court did not abuse its discretion in denying Stano's Rule 60(b) motion.

In addition to arguing that the publication of *Blind Fury* affected Crow's credibility, Stano asserted two other grounds in support of his Rule 60(b) motion to the district court: that the book provided substantive support for his habeas claims and that the attorney general's office acted improperly in failing to disclose to the district court that the book was being written. Stano apparently has abandoned these two arguments in his appeal to this Court. In any event, the district court's order implicitly rejected these two arguments when it found that Stano's "arguments are without merit" and that his allegations "demonstrate no facts which would undermine the previous findings of the Court." We see no error in those conclusions.

## III. CONCLUSION

We AFFIRM the district court's denial of habeas corpus relief and AFFIRM its denial of Stano's Rule 60(b) motion.[4]

## APPENDIX A

### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF FLORIDA

### ORLANDO DIVISION

Gerald Eugene Stano, Petitioner,

v.

Thomas L. Barton, Superintendent, Florida State Prison; Harry K. Singletary, Secretary, Florida Department of Corrections, Respondents.

Case No. 87–753–CIV–ORL–19

### *ORDER*

An evidentiary hearing was held in this case from January 22, 1992 through January 31, 1992 and from March 5, 1992 through March 9, 1992, pursuant to the remand from the Eleventh Circuit Court of Appeals in *Stano v. Dugger,* 901 F.2d 898 (11th Cir. 1990). Upon consideration of the evidence and the law, the Court enters its findings of fact and conclusions of law as follows:

### *I. BRADY CLAIM*

### A. *FINDINGS OF FACT ON CLAIM OF COLLUSION AND COERCION*

(1) *STANO'S CONFESSION TO THE MURDER OF MARY CAROL MAHER ON APRIL 1, 1980*

James William Gadberry, Jr., now a patrolman with the Daytona Beach Police Department, testified that on April 1, 1980, he "broke" the Maher case by developing the lead that solved it. Gadberry had just arrested Gerald Eugene Stano ("Stano") on that date for the aggravated battery of Donna Hensley in Daytona Beach, Florida. Stano had been brought to the Daytona Beach

---

4. Stano's motion to recuse the Attorney General's Office as counsel for respondent is denied.

Police Department for questioning by Gadberry, who was then a detective, and Detective Richard Zachary. During the course of this questioning, Gadberry determined that the wounds inflicted on Donna Hensley were similar to the wounds on the body of a homicide victim under investigation by his department, Mary Carol Maher.[1] Gadberry left Stano in the interview room and went into the office of Captain Marvin Eugene Powers where he announced with enthusiasm that he had solved the murder of Mary Carol Maher. Gadberry stated "We've got the guy responsible for the Maher murder," or words to like effect and also announced that the murderer was then in their interview room. This questioning of Stano by Gadberry occurred before any interview of Stano by Sgt. Paul B. Crow of the Daytona Beach Police Department.

Since Sgt. Crow was in charge of the Maher murder investigation, Captain Powers directed Crow to join Gadberry in the interview room to further question the suspect. Gadberry excitedly advised Crow that the wounds in the Hensley case and the Maher case were similar, particularly in the thigh areas, and that he, Gadberry, had solved the Maher case. Crow joined Gadberry in the interview room where Stano was questioned by both police officers.

During the course of this interview, Crow showed Stano a color studio photograph of two Maher sisters who were similar in appearance, and Stano immediately pointed to Mary Carol Maher as his victim. When Stano was asked to describe Mary Carol Maher, he stood up to give her height and weight by gesture and described her as being tall and athletic. Stano's description of the victim was accurate. On further questioning, Stano gave a correct description of the clothes Mary Carol Maher had been wearing. When Crow said Maher was wearing slacks and a shirt, Stano corrected him and identified her as wearing a white shirt with animal designs and jeans.[2] Stano also described how he murdered Maher, including stabbing her in the chest, thigh and back. His description of the wounds matched the autopsy report except that stab wounds in the back had not been included in the medical report on Ms. Maher. Stano stated that he had stabbed the victim in the chest as hard as he could. The autopsy reflected that her sternum had been broken. Stano further described the road which he traveled with her body, how he wrapped her in a foam padding or ticking, and how he left the body in an area near the airport, placing palm branches over it.

During this interview, Crow did not suggest to Stano what clothes the victim was wearing or her wounds or how the body appeared when it was located. Neither officer showed Stano police reports, the autopsy report, or any photographs except the one of the two sisters referenced earlier. (*See* transcript and recording of confession, Petitioner's 4 and 149.)

During this questioning of Stano, Gadberry walked in and out of the interview room. Captain Powers testified that Gadberry came out of the interview room several times and advised him that Stano was guilty of the Maher murder. The interview of Stano on this date lasted approximately one and one-half hours.[3] Captain Powers then directed

1. Gadberry's testimony was conflicting concerning the wounds on Donna Hensley. He first testified that her wounds were superficial in a picture he saw and that he had seen the wounds personally after they had healed. On cross-examination he admitted that he had no personal knowledge of the wounds but that he knew stitches were required.

2. Based on information from her mother, the missing person's report stated that Maher was last seen wearing a tan blouse and black slacks. News articles reported that she was last seen wearing tan slacks and a pink shirt with floral designs. (Respondent's 10). These reports did not accurately reflect what clothes were on Maher's body when it was found. Stano's description of her clothing was accurate.

3. Also during the course of this questioning, Detective Lewis of the Daytona Beach Police Department asked Crow to ask Stano if he knew anything about a missing person named Toni Vann Haddocks. At this time the officer did not know Ms. Haddocks was dead. No body of Vann Haddocks had been found, and Crow was given only her name and a photograph of her. When Crow showed Stano the picture of Toni Vann Haddocks, Stano responded "I don't have anything to do with black people." As noted below, Crow later learned that this was not true. Further, Stano also stated during the April 1, 1980 interview that he had killed a woman and left her body on an interstate highway which he believed to be either I-4 or I-95.

Crow and Gadberry to have Stano take them to the scene where Stano claimed to have left the body to see if Stano could corroborate his confession. The three men traveled in a marked police car with Officers Willie Azma and Grady Jackson following in a separate vehicle.

While the testimony is in conflict as to what occurred on the trip to the scene, the Court finds that Sgt. Crow did not show Stano the way to the place where Mary Carol Maher's body had been found. Stano directed Crow, who was driving the vehicle, to make the appropriate turns, and after he had directed Crow to a place where three roads diverged in an area which was approximately fifty percent a dump site, Stano picked the least traveled of the three roads to follow. The men got out of the two vehicles in which they were travelling,[4] and Stano directed them on foot some distance from the cars to the exact location where the body had been found. Stano cried as he pointed to the place where he had left Mary Carol Maher's body

and described how he had placed branches over her body before leaving.

On their return from the trip to the site where Maher's body had been found, Gadberry advised Sgt. Marvin J. White of the Daytona Beach Police Department that he had solved the Maher case, and the officers who had gone to the scene also reported to Captain Powers that Stano had led them right to the place where the body had been found and had cried.[5] Gadberry did not state any concern about the confession or the trip to the scene of the crime at the time of these events.[6]

In the days following Stano's initial statement on April 1, 1980, Sgt. Crow undertook further investigation. He had a second autopsy of Mary Carol Maher performed. He and the medical coroner went to the funeral home where the coroner examined the body and found for the first time the two stab wounds in the back of Mary Carol Maher which Stano had described and which the

4. Gadberry testified that they did not get out of the car at the site. Gadberry's testimony on this point is in conflict with the testimony of other witnesses.

5. Although Gadberry testified that his agency was under pressure to solve the Maher murder, Powers denied that his police department was under any out of the ordinary pressure to solve the homicide.

6. At the hearing before this Court, Gadberry testified that Stano gave no fact not first elicited by Crow and only agreed with what Crow said. However, Gadberry also testified that in his experience it is not unusual for a suspect to be reluctant to give details of a crime even though the suspect may not be reluctant to state that he committed the crime. Captain Powers testified that when Gadberry reported to him what happened on their trip to the crime scene on April 1, 1980, Gadberry did not indicate that he felt Crow led Stano to the body or that Gadberry was concerned about Stano's confession.

Sgt. White testified that it was not until 1985 or 1986 when Gadberry returned to the Daytona Beach Police Department after quitting to become a church director of youth ministries that Gadberry stated he felt Stano was not guilty of anything and that Crow had "made it all up." When Captain Powers learned of these statements by Gadberry, he conducted his own investigation and concluded that Gadberry was incorrect. While Gadberry testified that he told Cap-

tain Powers on April 1, 1980 that Stano only confirmed what Crow showed him, Crow and Gadberry filed reports after the April 1, 1980 interview of Stano (Petitioner's 154 and 155), and Gadberry signed a transcript of Stano's confession made on April 1, 1980 (Petitioner's 4). In Gadberry's police report made in April of 1980, he noted that Stano knew details of Maher's murder which had not been made public and that Stano had directed the officers to the place where the Maher body had been found.

While Gadberry testified before this Court that Crow pointed out things to Stano during this trip to the crime scene and that Stano merely agreed with Crow, Gadberry could not recall crucial information concerning the trip such as when they went to the crime scene, who was driving, whether Stano cried after pointing out the place where the body had been left and whether Stano mentioned anything about foam-backed ticking. There was evidence that during this trip to the crime scene, Gadberry attempted to engage Stano in repeated conversations and failed to observe the route that Stano was directing as well as the facts concerning the crime and its scene which Stano was providing. Gadberry's testimony before this Court is contrary to his police reports prepared in April of 1980 at the time of these events (Respondent's 4).

Further, Stano himself later wrote Kathy Kelly "Before being taken to jail, I took Paul to where I put a body behind the airport." (Respondent's 19–D).

medical examiner had missed in his first autopsy and medical report.

Crow asked Detective Lewis to check with jurisdictions south of Daytona Beach to see if the body of a woman had been located along I-4 or I-95. Lewis investigated and reported to Crow that no evidence on this alleged murder victim had been obtained.[7]

As the result of the confession of Stano on April 1, 1980, Crow did a complete records check of the Daytona Beach boardwalk area for missing persons, homicides, and any crimes involving the name Stano. Crow came up with several incident reports, and from these reports prepared a chart compiling this information.[8] From this information Crow learned that several women had accused Stano of assault and battery after picking them up at the boardwalk area. Crow compiled reports of crimes or missing persons concerning the following women: Ramona Neal[9], Debra Jackson, Donna Hensley, Mary Carol Maher, Hazel Allen and Patricia Courtney.

Crow then contacted Dave Hudson of the Volusia County Sheriff's Department for the names of other possible crime victims. From Hudson he obtained information concerning homicide victims, including Ms. Nancy Heard, whose body had been found three miles north of the Holiday Inn boardwalk, and Ms. Linda Hamilton, who had been reported missing from the boardwalk area and found on the beach in New Smyrna.

In addition, on April 1, 1980, Crow called Stano's mother and father who went to the Daytona Beach Police Department. Crow advised them that Stano had confessed to murder and asked for their input on his background and personality, which they provided.

Crow further researched Stano's background and found that in other jurisdictions of Florida as well as in Pennsylvania and New Jersey there were homicides involving a similar modus operandi to that of the homicide of Mary Carol Maher with such things as branches covering the female victims when their bodies were found. Crow also sent Stano's car to the crime lab for examination and visited Stano's room, but found no viable evidence.[10]

(2) *THE RELATIONSHIP BETWEEN CROW, JACOBSON AND McMILLAN*

Meanwhile on April 1, 1980, Stano called Don Jacobson from the jail and made a confession to him. Jacobson, an experienced criminal defense attorney who has handled several capital cases and who had previously represented Stano, called Stano's parents to advise them that he would like to represent Stano. Mr. and Mrs. Stano initially retained Jacobson. Then a few days later, they terminated this relationship and instead hired Michael Lambert to represent their son. When they were unable to pay Lambert's fee, they begged Jacobson to take the defense of Petitioner Stano again.

Jacobson entered an initial notice of appearance on April 9, 1980 to defend Stano against the charge of the murder of Mary

7. Approximately six months later in November of 1980 a state worker found a body in the median of I-95, and Dave Hudson of the Volusia County Sheriff's office reported that the unidentified body had been found. Crow in his investigation listed this victim as "Jane Doe".

8. This chart was similar to Respondent's 29 referred to in the course of this Court's evidentiary hearing. (*See* also Respondent's 28; Petitioner's 175).

9. Stano had stated during his April 1, 1980 interview that he liked to meditate at Tomoka State Park because his grandparents were buried there. The body of Ramona Neal, who was reported missing from the Daytona Beach boardwalk area, had been found in Tomoka State Park.

Neal's body was also located covered with branches.

10. On the tape recording of his confession to the murder of Ms. Maher, Stano explained how he got the blood out of his car with Glory rug cleaner, Clorox and "elbow grease". (Petitioner's 149). Gadberry, Crow and Nixon stated they were concerned when no blood or rips were found in the car by the crime laboratory. However Crow and Nixon felt the issue was resolved later in the case when it was ascertained that Stano had a fetish about cleaning his car. Further, Maher was incapacitated so quickly, there was no opportunity to struggle or tear the car's interior. Nixon also felt the crime lab used was not in a "state of the art" condition.

Carol Maher.[11] Because Michael Lambert was the attorney of record, Jacobson entered a second appearance on behalf of Stano on May 9, 1980. He was officially appointed as one of Stano's attorneys on May 15, 1980.[12]

Jacobson interviewed Stano several times, during which Stano confessed to the six murders in Volusia County which eventually became the basis for entry of a plea of guilty on September 2, 1981 described below. Stano confessed to Jacobson that he had committed other murders as well. Jacobson obtained court orders to hire a private investigator, Warren Walker, to go to the cities or areas where Stano said he had murdered people or left bodies in order to determine if Stano's confessions were "real"; in other words, Jacobson wanted to determine if Stano had truly committed these murders or was falsely confessing. (Petitioner's 117, 118, 121 and 122). Jacobson also obtained authorization to hire Ann McMillan, a psychologist, to obtain background information and to perform psychological tests on Stano. (*See* Petitioner's 116, 119). From the information he gathered through his own investigation, Jacobson determined to his satisfaction that Stano had in fact committed the murders which he confessed to committing to his attorney.[13] Jacobson testified that before he allowed Stano to enter a plea of guilty incident to the six Volusia County murders, he had ruled out the factual innocence of Stano through Jacobson's own, independent investigation.

Until Don Jacobson as Stano's attorney and Larry Nixon as the prosecuting attorney in the Circuit Court for the Seventh Judicial Circuit entered an agreement which would allow Stano to plead guilty and receive a sentence of life imprisonment for any murder he committed of a victim whose body was located in the Seventh Judicial Circuit, Jacobson described his relationship with Paul Crow as one of adversaries. Although Crow and Jacobson had known each other professionally since 1966, they were not personal friends and had associated with each other only in the context of their work within their respective professions.[14] Jacobson testified that he and Crow not only did not work together, but also that they were "enemies" until Jacobson and Nixon entered a deal to spare the life of Jacobson's client, Stano, as to the murder victims located within the Seventh Judicial Circuit. Until then, Jacobson did not tell Crow what Stano had confessed to Jacobson. Instead Jacobson would talk to Crow or have Warren Walker, his investigator, talk to Crow to try to find out how much Crow had learned concerning the various murders that Stano already had confessed to committing to Jacobson.[15]

Crow testified that he told Don Jacobson and Warren Walker from time to time in response to their inquiries the information

11. *See* also Petitioner's 157.

12. Although the order appointing Jacobson as counsel for Stano was not entered until May 15, 1980, Jacobson testified that Michael Lambert consented to Jacobson contacting Stano, acting as Stano's attorney and conducting an investigation of the case prior to the entry of this order.

13. Jacobson did not ask Dr. McMillan to find out if Stano murdered several women as Jacobson learned of the multiple murders from Stano and confirmed these confessions through his own investigation of the facts.

14. Jacobson testified that he knew Crow from prior cases that Jacobson had handled as a criminal defense attorney. He met Crow after Crow took a course in psychological profiles at the FBI Academy where Jacobson at one time had taught. Jacobson testified that from his past dealings with Crow, he knew Crow to be a fair and honest law enforcement officer.

15. Jacobson testified that Stano would make a confession, then later recant it. He would go from utter candor to denial from time to time. At the same time Jacobson was confirming by his own independent investigation that Stano in fact was guilty of the murders to which Stano confessed, Jacobson was also obtaining information concerning what Sgt. Crow knew about Stano's activities without telling Crow what Jacobson knew. Jacobson testified that what Crow revealed from time to time that Crow had learned in Crow's investigation of Stano only further corroborated what Stano had already confessed to Jacobson. In this manner, Jacobson was able to learn that Crow had linked Stano to the Toni Vann Haddocks murder, in addition to the murder of Mary Carol Maher, which were murders Stano had previously admitted to Jacobson that he committed. Jacobson also learned what Crow had ascertained about Stano's out-of-state murder victims in this manner.

that Crow was learning about Stano but that he never asked Jacobson or Walker for details and never requested that they ask Stano for details. During the course of his investigation of Stano, Crow told Jacobson that he did not think Stano had killed just one or two persons. Jacobson would respond to Crow, "Prove it." or "Show me." Jacobson did not indicate agreement with Crow or acquiescence in what Crow said. Jacobson did not give Crow any indication that Jacobson viewed Stano as a multiple or serial killer.[16]

In April or May of 1980, Jacobson began making contact with Larry Nixon, the prosecuting attorney, in an effort to obtain a plea agreement which would spare his client's life. Sometime around May of 1980, he approached Nixon and advised Nixon that he had "interesting information" but that he would want something in exchange for it.[17] In Jacobson's professional opinion, Nixon had a strong case against Stano in the Maher and Vann Haddocks murders, and he felt that the death penalty for Stano was likely. Jacobson testified that in Stano's confessions to him, Stano knew facts only the killer of these women would know.

Stano from the very outset had urged Jacobson to obtain for him a plea agreement that would spare his life because he feared the death penalty.[18] Stano as well as his parents had expressed their desire on several occasions for Jacobson to try to negotiate a plea agreement on behalf of Stano. Because Jacobson knew that Stano was involved in more than one murder, he continued to pursue the concept of a plea agreement with Larry Nixon, and a deal was struck in May of 1980 in which Nixon agreed to give use immunity to Stano as to any murders to which Stano confessed prior to entry of a plea of guilty and if the bodies of the victims were found in the Seventh Judicial Circuit. Jacobson and Nixon both testified that this agreement meant Stano would not receive the death penalty for any murder of victims whose bodies were found in the Seventh Judicial Circuit to which he confessed prior to entry of his guilty plea before Judge Foxman.[19]

The agreement between Nixon and Jacobson pertaining to this plea of guilty and sentence was limited to the Seventh Judicial Circuit, Nixon's jurisdiction. Jacobson made clear to Stano on several occasions, and he

16. Also, in May of 1980, Jacobson told Crow that he wanted everything Crow had on the Mary Carol Maher case so that Jacobson would not have to go through official discovery.

17. Nixon and Jacobson had been adversaries in previous legal matters. Before Jacobson began to approach Nixon for a plea agreement, Stano had confessed to Jacobson that he had killed several women. Jacobson did not recall on the witness stand all the names of the victims, but stated that Stano had confessed to him that he had killed Mary Carol Maher, Toni Vann Haddocks, Linda Hamilton, Ramona Neal, and Jane Doe before Jacobson began approaching Nixon to try to negotiate a plea agreement.

18. Stano also wanted Jacobson to assert on his behalf the defense of insanity at the time of the crime so that he could be sent to a mental hospital for a short time and then be released. The testimony indicated that Stano realized that his conduct was not normal, and he desired treatment. This was also indicated by his confession to the murder of Mary Carol Maher made to booking officer John Michael Gaston on April 1, 1980 during which Stano stated that he was sick and thought that since the police had put two and two together, and "had him", he felt confess-

ing was in his best interest and would help him go to a mental institution for a few years, be pronounced cured and then be released. (See Respondent's 38). Stano himself made this statement on the tape recording of his confession to the murder of Ms. Maher (Petitioner's 149) and in letters (Petitioner's 185a). Jacobson had Stano evaluated by two doctors in Gainesville in order to assert a defense of insanity, but when the plea agreement with Nixon was negotiated, this defense was not pursued further. However, based on compassion for Stano's parents who could not accept that their son committed these murders, Jacobson from time to time spoke in terms of insanity when he conferred with Stano's parents who desired to perceive their son as having a genetic form of insanity. Jacobson at no time advised Crow to question Stano within the context of, or with reference to, a defense of insanity.

19. Nixon testified that Stano was never offered life in prison in exchange for confessing to all murders he had committed. While Nixon felt he had enough independent corroborating evidence to obtain the death penalty for the murder of Mary Carol Maher, he also had discussed with Crow the latter's suspicion that Stano was involved in other, unsolved homicides.

testified that Stano understood, that if a body had not been left within the Seventh Judicial Circuit, Stano was not to talk about it to the authorities. Jacobson instructed Stano not to talk to anyone about the bodies of Stano's victims which were located outside the Seventh Judicial Circuit, and particularly since Stano had confessed by this time to Jacobson to the Scharf murder in Brevard County as well as to other murders outside the Seventh Judicial Circuit, Jacobson advised Stano that these other murders were outside the agreement that he had made on behalf of Stano with Mr. Nixon and were therefore "taboo", not to be mentioned or discussed by Stano with anyone.[20] Jacobson explained use immunity to Stano in May of 1980 and reiterated to him in several subsequent conversations that he should not discuss any murder in which the body of the victim was found outside the jurisdiction of the Seventh Judicial Circuit, including but not limited to the murder of Cathy Lee Scharf, because it was not covered by the plea agreement with Nixon. In addition, Jacobson explained to Stano that he should confess to all murders he had committed in the Seventh Judicial Circuit and left the bodies of the victims there because if Stano was found guilty of a murder after the plea of guilty was entered and he was sentenced by Judge Foxman, Stano would probably "get the electric chair" for that crime.

Jacobson also determined at this time that because of the circumstances of the case, because he knew that bodies would be located within several jurisdictions located within the Seventh Judicial Circuit and because he knew that there would be arguments among these jurisdictions over their respective authorities, that he would like Crow to be the clearing house for all of the cases to which Stano confessed pursuant to the plea agreement Jacobson had negotiated with Nixon.[21] In this manner Jacobson could work through Crow without having to deal with other police officers and agencies in the Seventh Judicial Circuit.[22]

### (a) Meetings between Crow, McMillan and Jacobson

It was approximately seventeen months from the date this plea agreement was struck until the entry of Stano's plea of guilty before the state trial court on September 2, 1981. Against this background, there were a series of three meetings involving Crow, McMillan and Jacobson, as well as others, which were the subject of evidence before this Court.

First, around May 7, 1980, Warren Walker requested a meeting with Crow to look at Stano's car at Jacobson's office. On this date, Crow had obtained Stano's statement about the murder of Mary Carol Maher and his statement about leaving another body on an interstate highway median. Crow went to Jacobson's office where he saw Walker and Jacobson and first met the psychologist, Dr. Ann McMillan, whom Jacobson had earlier hired to get background information and to conduct psychological testing on Stano. At this meeting, Crow learned that McMillan would examine Stano the next day. Crow talked to the people present for about thirty minutes, then searched Stano's car and left. While on the premises, Crow told Warren Walker that he thought Stano was involved in more than the murder of Mary Carol Maher and that he had reason to believe that

---

20. Further, Jacobson testified that as part of his obligation under the plea agreement, Stano wanted to take a lie detector test to prove that he killed the people he admitted killing, not to prove that he was innocent of these murders. Jacobson refused to allow this. (Petitioner's 184(a) dated 7/21/80).

21. Crow testified that it was not until after this plea agreement had been negotiated that Don Jacobson indicated to him that Stano might be a multiple killer. Jacobson testified that he asked

Crow not to query Stano about bodies outside the Seventh Judicial Circuit.

22. Jacobson testified that he was in contact with Stano several times a week. Even after Jacobson's representation of Stano had been terminated in November of 1982, Jacobson responded to letters from Stano in prison and admonished him not to discuss any murders outside of those in the Seventh Judicial Circuit unless he received use immunity first. E.g., Petitioner's 130 dated May 19, 1982.

Stano had been involved in the Ramona Neal case and the Toni Vann Haddocks case.[23]

Next, Crow saw Jacobson in Deland at the jail annex probably around May 8, 1980.[24] This was an unplanned encounter. Jacobson invited Crow to join him and Dr. McMillan at the Holiday House restaurant for lunch which lasted about one hour. Again, this meeting with Crow was not prearranged. During lunch, Crow was advised for the first time by Jacobson and McMillan that there was a problem with a test that McMillan had administered to Stano.[25] Jacobson and McMillan suggested that Crow also ask Stano to take the test again to the best of his knowledge.[26] Crow testified that no diagnosis of Stano was given to him by McMillan, and although McMillan and Jacobson discussed theories, Crow did not agree with what they were saying. Crow chose to remain silent rather than become involved in the conversation.[27]

The third meeting occurred approximately one week after this meeting in Deland at the Holiday House, sometime after May 9th but before June 3rd, 1980.[28] Within a week following the meeting at the Deland Holiday House, Larry Nixon told Crow that there was an agreement between Nixon and Jacobson and that Crow should cooperate with Jacobson and tell Jacobson exactly what Crow knew about any murders he thought that Stano may have committed to see if Stano would give information. Jacobson called Crow shortly thereafter to meet with him. This meeting was at Ann McMillan's office, and on Crow's arrival McMillan, Jacobson, and Stano's mother and father were present.

At this meeting, Crow identified to Jacobson and the others present the possible victims whom he suspected were linked to Stano and a general description of where the bodies were found: the girl in the blue and white bikini whose body had been found in Tomoka State Park [29], the girl whose body had been found by the power lines in Tomoka State Park [30], the girl who had been found on the beach at New Smyrna Beach [31], and the girl whose body Stano said he had left on an Interstate highway [32]. Crow did not tell Jacobson or any of the other persons present the details of these four homicides. He told them just enough information so that they could identify the murder victim to Stano and get information from Stano in order to fulfill the agreement Jacobson and Stano had struck with Nixon.[33] As a result of this third

---

**23.** Stano's first confession to Crow to the murder of *Toni Vann Haddocks* occurred on May 9, 1980 as discussed below.

**24.** Since over twelve years have passed since some of the events described in this opinion, it is understandable that some of the witnesses could not recall dates and details exactly.

**25.** Crow could not recall the terms used to describe the test or exactly what the problem was. Crow testified that he was not familiar with the phrases that were being used to describe McMillan's test. (*See* Petitioner's 7). McMillan testified that her test on Stano was conducted May 8, 1980.

**26.** Crow testified that he did ask Stano about the test within the week, and Stano admitted that he was deliberately flunking it.

**27.** McMillan and Jacobson were discussing a previous defendant represented by Jacobson, Mr. DeGregory, and the differences between short term and long term killers. It appears that they may have been trying to persuade Crow to view Stano as a short term killer in an effort to cause him to limit his investigation, although Jacobson and possibly McMillan knew at this time that Stano had confessed to Jacobson that he had committed murders about which Crow either knew nothing or considered Stano only a suspect. When they asked Crow point blank for his opinion, Crow retreated from the conversation and told them he would let them know his views in the future when it was appropriate. Crow suspected at the time that Stano might be a long term killer.

**28.** On May 9, 1980, Crow had interviewed Stano concerning the Vann Haddocks' murder after giving Stano his rights. Stano confessed to this murder as described below.

**29.** Ramona Neal.

**30.** Nancy Heard.

**31.** Susan Hamilton.

**32.** Jane Doe.

**33.** Although Warren Walker, Don Jacobson's investigator, had been in and out of the Daytona Beach Police Department on his own investigations, Walker was not helping Crow in any investigation which Crow was conducting. Walker had requested from Crow information on mur-

meeting, Jacobson was to talk to Stano and was then to provide information on the murders in the Seventh Judicial Circuit in which Stano was involved.[34]

At no time did Crow ask Mr. or Mrs. Stano or any of the other persons present to obtain information for his investigation from Stano. Jacobson, however, asked Stano's parents to talk to their son to urge him to be truthful.[35] At this time, in an effort to comply with the provisions of the plea agreement he had negotiated for his client with Larry Nixon, Jacobson consented to Stano talking to Paul Crow about murders for which Stano was responsible in the Seventh Judicial Circuit.

### (b) McMillan's Lack of Influence on Crow's Interrogation Techniques

From the evidence presented, the Court finds that at no time did Dr. McMillan give instruction to Sgt. Crow on how to interrogate Stano nor did Crow ever discuss with McMillan how to question Stano. When Crow first met McMillan, he had already obtained at least one confession from Stano to a murder Stano had committed. Further, Crow was a seasoned investigator who had attended the F.B.I. Academy and had extensive instruction in courses such as psycholog-

ical profiles, personality dysfunctions and serial killers.[36]

The source of Petitioner's contention that McMillan instructed Crow as to how he should interrogate Stano appears to have come from McMillan herself and McMillan's subsequent statements to news reporters.[37] McMillan testified that on one of the three times noted above when she met Crow, she understood that Jacobson told her to discuss with Crow how to question Stano. She testified that at the time she felt it was ludicrous for her to tell a trained police officer how to conduct an investigation and felt uncomfortable with Jacobson's alleged suggestion. Since she had read something about Ted Bundy, McMillan stated that she said in response to Jacobson's direction, "Feed on his ego", and also that Stano would "lay down false trails". She testified that she was very general and not specific in her statement to Crow and that she knew at the time that Crow already had a confession from Stano. Further, she testified that she had no knowledge of any interrogation methods used by Crow. She knew at the time that Crow was a well trained and highly regarded police officer and stated that she had no idea why anyone would ask her to tell Crow how to

---

ders Crow suspected that Stano had committed. Crow gave Walker cases and a general description of the murders but no details.

34. From April of 1980 when Stano confessed to the murder of Mary Carol Maher until September of 1981 when Stano entered his plea of guilty with reference to the six Volusia County murders, Crow did not give Jacobson or his agents police reports, photos of crime scenes, or reports on homicides which he suspected Stano had committed. Crow also did not show Stano the police files or investigative reports on any homicides.

35. According to Eugene Stano, Petitioner's father, Jacobson had explained to him that Stano should confess to any murders that he had committed in Volusia County so he could get life in prison instead of the death penalty. Jacobson explained that there were several open cases that were unresolved and that Stano should confess to what he knew in order to set the minds of the victims' families at ease. On cross-examination, Eugene Stano admitted that no one indicated to him that Stano should falsely confess, and that when he saw his son in jail that he did not tell

his son to lie or to confess to crimes that he did not commit but instead told his son to tell the truth.

36. Crow was able to do his own informal profile of a suspected killer. From his first interview of Stano on April 1, 1980, Crow formed his own opinion of Stano as a person who liked to cruise in an automobile and who liked cars, who would pick up prostitutes, who was very neat and methodical, and who was very angry. Stano had advised Crow in the first interview that when Stano was drinking, he would go into a rage and "see red". Stano also stated several times that he liked his car, and Crow observed that he was very neat and particular, especially about his clothes.

37. Testimony with reference to news articles about Petitioner underscores the unreliability of news media reporting relating to Stano in many instances. Further, from time to time newspapers in one area would reprint stories from newspapers in another area without verifying the factual accuracy of the information being printed.

interrogate Stano.[38]

If this conversation occurred at all, and both Jacobson and Crow deny that it did, this simplistic statement by Dr. McMillan did not rise to the level of McMillan instructing Crow on how to interrogate Stano. "Feeding" on the ego of a suspect is a well known method of interrogation by law enforcement which was neither invented by McMillan nor revealed by her to Crow for the first time. Further, there was no evidence that this interrogation method was employed by Crow.

Finally, the record reflects that Crow knew long before he met McMillan that Stano did not immediately confess to crimes he committed and "laid down false trails", *i.e.* in Stano's claim that he did not associate with black individuals when asked about Toni Vann Haddocks.[39] At best, McMillan appears to have misperceived a comment by Don Jacobson during the course of one of the three encounters she had with Crow. In any event, her statement that Stano would "lay down false trials"; and that Crow should "feed on his ego," if made, was either not heard by Jacobson and Crow or, if heard, was viewed as so utterly insignificant as to be unworthy of note.

McMillan's role was limited and strictly defined.[40] She had been hired by Jacobson for the purposes of administering a psychological test to Stano and gathering background information as noted above. She was not trained in police interrogation methods. There was no evidence that any statement she made had any effect on how Crow interrogated Stano.[41] Crow testified that he did not discuss with McMillan ways to interrogate Stano, the manner in which to pose questions, the areas to cover or how to interrogate a suspect in multiple murders.[42] By the time McMillan met Crow, Crow was far ahead of McMillan in his investigation of Stano and in his training on how to interview criminal suspects. Crow did not need, or receive, any assistance from Dr. McMillan in conducting interrogation incident to his investigation of Stano.

### (c) No "Covert" Copy of Jacobson's Letter Delivered to Crow

Finally, the evidence is undisputed that Crow never received a "covert" copy of a letter from Jacobson to Stano dated July 12, 1982 (Petitioner's 36 and 132). Crow did not see and did not discuss this letter or its contents with anyone until this issue was raised by Stano in his post trial habeas petitions.

Further, Crow never told anyone that "he was Stano's best source." Jacobson testified that he meant in this letter by the statement "your best source is still Sergeant Paul Crow" that Crow was the best source for Stano to find out if there was use immunity for any murder he committed in addition to the six Volusia County murders to which he confessed before he entered his plea of guilty on September 2, 1981.[43] Jacobson testified that he had intended to send, but did not

---

**38.** McMillan testified "Beats me why Jacobson would ask me to do this!" or words to like effect.

**39.** This contention by Petitioner that McMillan told Crow how to interrogate Stano should be compared to Petitioner's contention based on Officer Gadberry's testimony that Crow told Stano the facts of the case to elicit "false" confessions. However, the record contains instances where Crow refused to tell Stano facts concerning the case. *E.g.*, Petitioner's 38, pp. 7–8.

**40.** McMillan testified that after meeting Crow at the Deland jail annex, she had no impression that he was working together with Jacobson. She testified that Don Jacobson never said he was not interested in representing Stano unless she found Stano to be a serial killer. McMillan stated that she found no reason to question whether Stano was a serial killer as Stano confessed to committing more than one murder to her. McMillan testified that she did not know of any plea negotiations between Nixon and Jacobson.

**41.** As referenced earlier, Crow disagreed with McMillan's theories.

**42.** When shown articles from newspapers written by Terry Ecker stating that Crow spent hours with McMillan to learn how to interrogate Stano, Crow testified that he never stated this to anyone and that this statement is untrue.

**43.** Jacobson's representation of Stano had ceased thirty days after entry of this plea.

send, a copy of this letter to Crow[44] to underscore that there was no promise of life imprisonment as to any other murders Stano confessed to committing and to make Crow understand that Stano should be asking for immunity. The Court finds that Paul Crow had no knowledge of this letter at any time prior to being questioned about it incident to Petitioner's allegations in this case.

### (3) CONFESSION TO MURDER OF TONI VANN HADDOCKS

Meanwhile, Toni Vann Haddocks had been listed as a missing person from Daytona Beach, Florida. Around April 6, 1980, her body had been found in Volusia County in an area where Stano used to live and which was near the residence of Stano's brother.[45] Stano did not have a good relationship with his brother at the time. On April 20, 1980, at the request of Detective Lehman of the Volusia County Sheriff's Department, Crow went to the scene in Volusia County where the portions of the body had been found.[46] Crow felt from the scene where the body was found that there were similarities between the murder of Toni Vann Haddocks and the murder of Mary Carol Maher, particularly the fact that branches of small trees had been used to cover the bodies of both victims. Further, Crow was advised that the University of Florida Anthropology Department had determined that a possible weapon used in the Vann Haddocks murder was a can opener, a weapon which had been used by Stano in the Donna Hensley case. (Respondent's 7).

Stano had denied knowledge of Toni Vann Haddocks in his initial interview with Gadberry and Crow on April 1, 1980, stating that he did not associate with blacks. However,

when Crow sent Detective Lewis, a man who is similar in physical appearance to Stano, to an area known as "Ridgewood" which is frequented by black prostitutes, in order to obtain information, the black prostitutes at first thought Lewis was Stano. Several of these prostitutes stated they knew Stano from previous associations with him. When Lewis reported this information to Crow, Crow realized that this information contradicted what Stano had stated earlier on April 1st.

Between April 1, 1980 and May 9, 1980, Crow stated that he saw Stano five or less times. On these occasions he tried to get background information on Stano and to maintain rapport. Crow and Detective Lehman of the Volusia County Sheriff's office, which had jurisdiction over the Vann Haddocks investigation, decided that Crow should talk to Stano about the Vann Haddocks' murder as an experiment to see if Stano would talk to Crow based in part on this rapport.

On May 9, 1980, Crow talked to Stano about the Vann Haddocks crime after Stano was given his rights and signed a waiver form (Appendix 73 to Petition for Writ of Habeas Corpus). Stano confessed to this crime (See also Petitioner's 158). The body of this victim had been scattered by animals. Stano knew details concerning the victim which the police did not know. For instance, when Crow asked Stano if he knew something about the victim which the police would not know, Stano stated that Vann Haddocks had a cast on her arm. When Crow asked Stano if it was a sling cast, Stano stated that it was an arm cast not a sling cast.[47]

On May 19, 1980, and June 3, 1980, Crow and Lehman interviewed Stano, telling Stano, inter alia, that other jurisdictions wanted

44. Crow testified that he did not see this or various other correspondence from Jacobson. (E.g., Petitioner's 137, 138 and 139).

45. The Vann Haddocks' body was found after Stano confessed to the murder of Ms. Maher on April 1, 1980.

46. Detective Lewis of the Daytona Beach Police Department had obtained information concerning Volusia County's investigation and had conveyed this information to Crow.

47. In addition to other facts of the crime, the location Stano described where he had left the victim was a complicated location four houses away from where Stano had formerly lived and where his brother lived at the time. Further, the photographs of the victim did not show a cast, only the victim's face. Stano accurately described her height and weight and also described how he cleaned his car after this murder.

him for murders which it was suspected he had committed in such other jurisdictions. and that it was not likely that these jurisdictions would be interested in Stano if Stano was doing a term of life in prison in Florida.[48] They also advised Stano that they did not have enough information to keep Stano in Florida.[49] Crow testified, particularly with reference to the plea agreement that had been entered by Stano through Don Jacobson with Larry Nixon, that they as police officers were not misstating the case when they said that they were working with Stano in order to obtain a confession in the Vann Haddocks case. Crow testified that in this interview, Lehman acted as the lead interrogator and that Crow disagreed with Lehman's theory that Stano had multiple personalities. (See Petitioner's 149).

(4) CONFESSIONS IN MARCH OF 1981 TO MURDERS OF HEARD, HAMILTON, NEAL, AND JANE DOE

Between May 19, 1980 and March of 1981, Crow continued to talk to Stano and to see him from time to time in jail although their conversations were not about cases.[50] Although Stano called Crow on the telephone, and wrote and called others including Ann McMillan, Crow had only Stano's confessions to the Maher and Vann Haddocks murders during this period of time in spite of the fact

that he had previously told Jacobson of his suspicions concerning four additional murder victims in Volusia County.[51]

Around March 6, 1981, Stano indicated that he wanted to talk about other murders in Volusia County. Crow contacted Jacobson and Nixon, and a court order was issued, with the knowledge of Don Jacobson, to allow Detective Hudson of the Volusia County Sheriff's Department and Sgt. Crow of the Daytona Beach Police Department to bring Stano from the Volusia County jail to the Daytona Beach Police Department for questioning. This transportation occurred on March 12, 1981.[52] (Petitioner's 21, 22, 37 and 128).

On March 12, 1981 Crow advised Stano of his Miranda rights, and Stano executed a waiver form. Crow and Hudson then questioned Stano concerning the four cases for which he had been transported to Daytona Beach as part of the plea agreement to discuss and which were referenced in Stano's March 6, 1981 letter: the Nancy Heard, Jane Doe, Ramona Neal, and Linda Hamilton murders. Stano gave additional details of each murder beyond what Crow had related to Jacobson and Stano's father in their last meeting. Crow was not familiar with many of the details of the cases. The investigators took four confessions from Stano, one after another, concerning Hamilton, Neal, Jane Doe and Heard in that order. These confes-

48. The transcript of the interview of Stano by Officers Lehman and Crow on May 19, 1980 is Petitioner's 31 and 32, and on June 3, 1980 is Petitioner's 33.

49. Crow had been contacted about unsolved murders by authorities in Pennsylvania and New Jersey.

50. Don Jacobson knew that Crow talked to Stano during this period of time. Stano would call Crow and ask for a radio or tapes or ask questions about his family. Crow tried to satisfy his requests in order to maintain rapport.

51. See Petitioner's 32, p. 16, in which Stano insisted on May 19, 1980 that he had only killed two women, Maher and Haddocks. Accord, Petitioner's 33, p. 6. When Steve Lehman left the Volusia County Sheriff's office, and Dave Hudson took over responsibility for Lehman's cases on behalf of that agency as well as other cases, Crow learned of additional missing women from

Hudson, such as Susan Bickrest. (See Respondent's 13 and Petitioner's 17).

52. While Crow had previously testified that he picked up Stano on March 6 and that Stano on that date gave the confessions described later in this opinion, he corrected himself at the hearing before this Court and stated that he had been mistaken about the date earlier. Since the date of Stano's letter was March 6, 1981 and the court order directing him to pick up Stano was executed on March 12, 1981, Crow testified that Stano's confessions could not have occurred on March 6th as he had previously stated. Crow testified that he was confused previously about the date because of the date on Stano's letter. However, he stated that he believed that Stano delivered the letter dated March 6, 1981 to Hudson and Crow when they picked Stano up on March 12, 1981. It does not appear to this Court that this misstatement has material impact on the issues in the case. (See Respondent's 13 and Petitioner's 17).

sions were transcribed and later signed by Stano after review on March 17, 1981. (Petitioner's 168(a)–(d)).

Although Stano was asked questions concerning the four murders and bodies found in Volusia County pursuant to the plea agreement between him and his attorney, Don Jacobson, on the one hand and Larry Nixon on the other, and although he had been admonished by his attorney not to reveal the murders he had committed outside the Seventh Judicial Circuit, in the course of trying to relate facts and reconstruct the route he took with reference to the Jane Doe murder, Stano became confused over whether he had left the body in a median on Interstate 95 or Interstate 4.[53] In the course of discussing the Jane Doe murder and trying to retrace his route and the events of the murder, Stano "went off on a tangent" and volunteered information about Titusville and taking the girl to a skating rink, stabbing her and putting her in a dried ditch, then throwing her purse out of his car. Crow noted to himself that these facts did not fit the facts of the case about which Stano was being questioned although no name for this victim was given.[54] Stano did not mention the name of Scharf, and Crow did not feel at this time that Stano was making a confession to a murder. Crow made a notation of these facts given by Stano on his notes concerning the murder of Susan Bickrest, a victim whose name was supplied to Crow by Dave Hudson.

During these confessions on March 12, 1981, Stano gave additional details about the four murders. Neither Hudson nor Crow gave Stano details or case report files. Neither man coached Stano or edited sections of the tape recording of his confessions. Detective Hudson had the files on each of the four cases which he did not give to Sgt. Crow.

On March 12, Stano was returned to the Volusia County jail, and the investigators made plans to have Stano take them the next day, March 13, 1981, to the sites where two bodies had been found.

On March 13, 1981, Hudson, Crow and Stano drove to Tomoka State Park, an area comprising thousands of acres of everglades-like vegetation. Here Stano first directed the officers to the location where he had left the body of Ramona Neal.[55] Crow did not know where this body had been found. Stano pointed out the site after directing the officers to make the proper turns. Hudson confirmed to Crow that the place Stano identified was in fact the place where the Neal body had been found.

Next, Stano directed the officers to drive approximately two miles away in the area of power lines where Stano identified the place where he had left the second body, that of Nancy Heard. Stano referred to this area as Cobb's Corner. Crow did not know the area or where the body had been found and could not see the power lines until Stano directed the officers to the exact location where he had left the body. Hudson again confirmed to Crow that Stano had identified the place where this body had been found.

On September 2, 1981, Stano entered a plea of guilty to the Volusia County murders of Maher, Vann Haddocks and Heard, and in exchange was sentenced to life in prison after a hearing to determine his competency.[56] The Hamilton, Neal and Jane Doe cases were not prosecuted. Respondent's 17(a). At no time did Jacobson reveal to the authorities information he had learned from his client regarding the homicides Stano had

---

**53.** At one point in Volusia County these two interstate highways intersect.

**54.** Up to the time Stano entered his plea of guilty incident to the six Volusia County murders, Stano insisted to Crow that he had murdered only six girls, Maher, Vann Haddocks, Heard, Hamilton, Neal and Jane Doe. It was not until after the plea of guilty had been entered relating to these six cases that Crow tried to get information on a possible victim from Titusville and called Kathy Kelly at the newspaper for assistance. (See Petitioner's 32, p. 16, in which Stano insist-

ed on May 19, 1980 that he had only killed two women, Maher and Haddocks. Accord, Petitioner's 33, p. 6.)

**55.** Stano had orally described landmarks and demarcations along the route he took to dispose of this body during his confession to this murder on the preceding day. (Petitioner's 168–B).

**56.** Respondent's 17, 17(a) and Petitioner's 15, 123, 126, 128 and 129.

committed outside the Seventh Judicial Circuit beyond these six murders encompassed in this September 2, 1981 plea of guilty.[57]

### (5) *CONTACT OF STANO BY OTHERS THROUGH PAUL CROW*

There is no evidence that Stano was deprived from contact with others by Sgt. Crow.

Stano was housed at a variety of prisons in addition to the Daytona Beach jail. For instance he was housed at the Volusia County jail at Deland, the Seminole County jail and at Florida State Prison. He was also subject to visits and interrogations by persons who had no relationship to Paul Crow.[58] In particular, Stano's father, Eugene Stano, testified that he saw Stano whenever he wished, whether Stano was in Starke or Daytona Beach, and that he saw his son several times in Crow's office. He was at no time prohibited from seeing his son.

Even when Stano was brought back to the Daytona Beach jail pursuant to court order in August of 1982, Stano was not deprived of contact with other persons. The state court had directed in its order that the Sheriff of Volusia County and the Chief of the Daytona Beach Police Department must keep Stano "safely held in close custody." (Petitioner's 37). While safety precautions were implemented as noted later in this opinion to route visits to Stano through Crow while Stano was at the Daytona Beach jail in order to prevent threats on Stano's life, for Stano's security, comfort and safety, and to channel, not prevent, visits to Stano, the Court finds that there is no evidence that Sgt. Crow prevented anyone from seeing Stano.

### (6) *THE BOOK(S)*

It is not surprising in view of the nature of the crimes which were being investigated with reference to Stano that several people contemplated writing books about the events which were rocking the small Florida east coast beach community, and further that rumors concerning future books and potential wealth to be derived therefrom abounded in this community.

Several people contemplated writing books. Stano himself wanted to write a book and wrote several people, including his attorney Donald Jacobson, concerning this possible venture. There was evidence that Stano's parents initially wanted to write a book until they were inundated by news articles. Kathy Kelly, a staff writer of some 29 years with the Daytona Beach News Journal, went so far as to submit several chapters of her proposed book to a literary agent, but she testified that she has not pursued this venture further. Terrell Walter Ecker, a free lance writer and journalist for over 25 years, also began work on a book in which he hoped to focus on Crow's investigation and other investigations of Stano. Ecker had a literary agent, the Foley Agency in New York City, but his work remained unfinished after he suffered a brain aneurysm in April of 1982. The subsequent brain surgery ended his hope of writing a book.

In contrast, Donald Jacobson testified that he at no time had an interest in writing a book and never took any action toward authorship of one.[59] However, both Donald Jacobson and Kathy Kelly testified that there were many rumors that Crow was going to write a book and that both of them mentioned the rumors to Crow on occasion. Both Kelly and Jacobson stated that Crow never indicated to them that he was writing a

---

**57.** Between approximately March and September of 1981, Crow learned about unresolved homicides of Susan Bacile, M.K. Muldoon, Barbara Bauer and Susan Bickrest, but obtained no acknowledgment from Stano that he was involved in these cases. He was contacted by Detective Denton who advised him on September 4, 1981 of the Barbara Bauer homicide after Stano entered his plea of guilty before Judge Foxman.

**58.** Some of these visits are noted in this opinion. (*See* also Petitioner's 187 for a description of Stano's confession to Detective Denton in Starke regarding the Bauer murder.)

**59.** Jacobson's former wife, Nancy Jacobson, testified that she did not recall Donald Jacobson ever expressing an interest in writing a book himself. The Court notes this testimony because it was apparent from this witness' demeanor and testimony on the witness stand that her feelings toward her former husband were not amicable.

book, although they knew he had been approached by many people to do so. Kelly testified that when she told Crow about her book, Crow did not suggest that they author a book jointly. Jacobson stated that the rumors about Crow writing a book became a form of a joke. When people would see Crow, they would greet him with "Well, how is the book going?" as a humorous form of greeting.

After hearing the testimony of the witnesses on this issue, it appears to this Court that the purported knowledge of some witnesses as to an alleged book Crow intended to write is based upon rumor and not fact. For instance, Kenneth James Morrison testified that he was in a room while Crow and Stano were talking about a book but that he did not know if they were serious or joking. He has no clear memory of the time of this conversation or what was said but testified that it was "a well known fact" among the investigators working on the case that a book was going to be written. He further testified that it was "almost a joke".

The Court finds that testimony given by Paul Crow on the subject of his potential authorship of a book is the most credible evidence provided by any of the witnesses in the case on this subject. Sgt. Crow testified that the concept of a book has at all times been and remains only a possibility in his mind. In any event, he felt that any book in which he made any contribution while his investigation was ongoing would harm his investigation, and he did not intend to pursue the concept of writing a book until his investigation had been completely ended. He testified that rumors abounded in his office that he should write a book and that he could get rich from it. Further, many people contacted him about the possibility of writing a book. He took no steps to make this a reality and rebuffed all inquiries except for one from Terrell Ecker.

In 1981 or 1982, Terrell Ecker was one of the persons who contacted Crow about writing a book. Crow thought Ecker's idea was interesting and talked with Ecker about a possible collaboration in the future. However, when Crow further read some of Ecker's work, Crow decided that he did not like Ecker's style, which he felt was sensational with sexual overtones and of a tabloid approach. Crow's concept of any book that he might participate in writing in the future would be limited to an informational and educational book for law enforcement academies to use in training officers how to investigate a multi-jurisdictional case. Crow felt that there was no treatise at the time to explain to law enforcement agencies how to deal with conflicts among jurisdictions investigating cases which, from his own experience with the Stano case, had led to confusion and frustration.[60]

The initial contact of Crow by Ecker concerning the possibility of jointly writing a book in the future was only that, an initial overture to discuss the possibility of a future joint effort. Crow did not talk to Ecker's agent, had no literary agent himself, and did not authorize Ecker to discuss the possibility of a book with Ecker's agent. Crow did not enter any agreement with Ecker, and the idea of a joint book was not further pursued by Crow past this initial overture. Ecker's inquiry had no effect on the way Crow investigated Stano's crimes. The initial solicitation of Crow by Ecker was rejected after Crow determined that Ecker's work was inaccurate, sensational and glamorized.

While Terrell Ecker did not appear to know about Crow's evaluation of Ecker's work, his testimony basically echoes that given by Crow. Ecker stated that he discussed writing a book with Crow after Stano had entered a guilty plea to the six Volusia County murders and he thought the cases involving Stano were over. Ecker testified that neither he nor Crow would be comfortable writing a book about an ongoing case. Ecker further testified that it was his intent to write a book with or without Crow, and that he had solicited Crow's input because he felt Crow would add "color" to Ecker's book. Ecker did not testify to any additional con-

---

60. Crow had also been working on a computer program to help multi-jurisdictions identify crimes involving similar facts.

tact with Crow after Ecker's initial overture to Crow, although Ecker did confer with his literary agent about a possible book. Ecker did not pursue the book concept further for himself or anyone else after his brain aneurysm.

This contact by Mr. Ecker concerning the possibilities of writing a book in the future was the only one Crow did not immediately reject.

When he testified before the Court in 1992, Paul Crow stated that he still thought from time to time about writing a book, although he has not taken any steps to make this idea come to fruition and has not prepared for publishing, or published, anything, either directly or indirectly, alone or with anyone else, concerning Stano.

While Crow testified that there was a great deal of office talk about the potential of writing a book and that many people told him "You should write a book—you'll get rich!", he took no steps to author a book from the time he first met Stano to the present date. His brief conversation with Mr. Ecker about the potential of writing a book together was quickly dispelled by Crow's own decision concerning the inappropriateness of Ecker's style, and in any event was a contemplation which was not to be pursued until Crow's work investigating the crimes of Mr. Stano had been concluded. This brief discussion was not pursued further. Crow's consideration of the idea of writing a book sometime in the future has remained the contemplation of a person who finds himself, because of unique historical events, in a position to

make a scholarly contribution to law enforcement at some appropriate time in the future. That time has not yet arrived. There is no evidence that this thought had any impact whatsoever on Crow's investigation of Stano.[61]

From the evidence presented, the Court finds that Crow did not discuss jointly writing a book with Stano or intend that he and Stano would share in the proceeds of a book. The Court finds that Paul Crow did not state to anyone that "the more confessions Stano made, the better Crow's book would be" or words to like effect. Petitioner's assertions to the contrary are without merit.

## (7) INVESTIGATION AND PROSECUTION OF STANO FOR THE MURDER OF CATHY LEE SCHARF

During Stano's confessions on March 12, 1981 as part of his plea agreement with the State Attorney in the Seventh Judicial Circuit, and as noted earlier while Stano was trying to piece together his route in the Jane Doe murder where the victim was left in the median of an interstate highway, Stano mentioned facts concerning his route which appeared to be inconsistent with the information Crow had ascertained as to the six homicides under investigation in Volusia County. Shortly after March 12, 1981, Crow called Captain DeWitt of the Brevard County Sheriff's Department to ask if he had any information concerning a homicide from the sparse facts that Stano had related.[62] Crow did not have a name of a victim. Captain DeWitt stated he recalled nothing about any

---

**61.** The Court rejects as unreliable the testimony of Susan Nix that Crow stated to her that he was writing a book about Stano and that the more murders Crow solved the better the profits would be. Not only is Ms. Nix's recollection of these purported conversations vague, but also Ms. Nix's recollection of the facts proved inaccurate in other regards. For instance, she testified that Mr. Morrison, whom she supervised, reported to her that Crow would not let Morrison see Stano, but Morrison testified that he had never tried to see Stano and had not been with anyone who wanted to see Stano. Further, it appears that on at least two occasions, Paul Crow had asked then Detective Nix at the Daytona Beach Police Department to leave the interview area while Stano was present, stating that Stano would not talk in

the presence of a lady. These requests appear to have offended Ms. Nix who had conducted initial investigations of some of the murder victims. Further, Sgt. Crow testified that he does not recall ever discussing his idea of a text book with Nix or telling her that he would make a fortune from a book.

Crow did not discuss writing a book with Mr. Morrison or Mr. Eugene Stano, Petitioner's father. Further, he never heard that Don Jacobson was writing a book and did not discuss writing a book with Don Jacobson.

**62.** Titusville is located in Brevard County, Florida in the Eighteenth Judicial Circuit.

homicide victim in Brevard County which might be consistent with such facts.

Sometime later, Crow asked Kathy Kelly, a reporter with the local newspaper in Daytona Beach, if she had heard of any case that might fit the information. Kelly researched the matter and sent Crow a copy of an October 6, 1977 news article.[63] Crow then wrote the State Attorney for Brevard County, Douglas Cheshire, Jr., in the hope that his office would commence an investigation, since Crow felt there had been a lack of response from the Sheriff's office.

Approximately two months later, in April or May of 1981, an Assistant State Attorney from Brevard County called and told Crow that they would be in touch with him in the future. Thereafter, Lt. James Bollick of the Brevard County Sheriff's Department called Crow to advise that Detective Johnny L. Manis of his office would be investigating the case.[64] Some time elapsed, and when Crow was not contacted, Crow then wrote Manis a letter dated November 20, 1981, some seven to eight months after Crow had originally called Captain DeWitt. (Petitioner's 34).

Manis stated that he talked to Crow by telephone after receiving Crow's letter. However, up to December of 1981, Manis testified he did not do much work on the Scharf case except to talk to Crow by telephone. While Manis testified that during a telephone conversation with Crow in November or December of 1981, Crow advised that he had been given some information by Stano, Crow did not state he had a confession from Stano as to this murder.[65]

On January 20, 1982, Manis went to the Florida State Prison with Mr. Bollick to talk to Stano. Manis introduced himself and talked to Stano for approximately two hours after first advising Stano of his rights.[66] Manis testified that he and Stano talked about many things, ranging from putting in a sprinkler system to the Scharf case. Manis was attempting to build his own rapport with Stano and intended to see Stano again. Since Manis was the homicide investigator in the jurisdiction charged with prosecuting the case, Manis did not invite Crow to join him.

In the course of this interview, Stano told Manis that he did not recall any crimes in Brevard County and did not recall telling Crow about any. Manis testified that Stano did not deny the crime. According to Manis' testimony, Stano basically stated that he did not remember the incident, and the bottom line was that Stano did not admit to committing the murder.

When Manis returned to Brevard County, he contacted Sgt. Crow and told him that Stano had not admitted to the murder of a victim found in Brevard County. Crow responded that Stano would only talk to persons if he liked them [67] and stated that he, Crow, would try to get back over to talk to Stano at sometime in the future at the Florida State Prison.

Between January 20, 1982 and April 23, 1982, Manis talked to Crow by telephone approximately two to three times. Manis noted that Crow was extremely busy. During one of these telephone calls to Crow, Manis told Crow that he wanted to go to Florida State Prison again to interview Stano with reference to two murder victims, Sandra Dubose and Cathy Lee Scharf. Manis testified that he requested that Crow ask Stano if Stano would talk to Manis because Manis felt Crow had rapport with Stano.

63. Petitioner's 169.

64. From September 2, 1981 when Stano entered his plea of guilty before Judge Foxman until August 10, 1982 when Stano was brought from Florida State Prison to Daytona Beach, Crow went to Florida State Prison twice to see Stano and to listen to anything Stano had to say, but not to question him about the Scharf case.

65. Detective Johnny L. Manis identified his reports on the Scharf case which he made while he was a Brevard County Sheriff Homicide Detective (Petitioner's 47 and 49). He identified Crow's first letter with information on a homicide in the Brevard County jurisdiction.

66. Sgt. Crow had nothing to do with Manis' initial interview of Stano at Florida State Prison.

67. Other than this statement, Crow did not advise Manis how to interrogate Stano, and Crow and Manis did not discuss interrogation methods. Manis did not meet or know Ann McMillan or Don Jacobson.

Thereafter, Crow drove to the prison, and Manis flew there with his supervisor, Mr. Bollick. Because Manis was late in arriving at the Florida State Prison, he met Crow as Crow was leaving the prison. Crow advised Manis that Stano insisted on being transported back to Volusia County before Stano would talk further to anyone about any crime. Crow advised Manis that he was going to try to obtain authority to have Stano transported back to Daytona Beach and that he would let Manis know if that could be accomplished.

Pursuant to an order of the state court, Stano was returned from the Florida State Prison in Starke to the Daytona Beach jail during the week of August 10, 1982 (Petitioner's 38). Since the Daytona Beach jail is not a maximum security facility and since many jurisdictions were seeking to have their representatives question Stano, a procedure to route all requests for interviews of Stano through Crow was devised for security as well as for the protection of Stano.[68] After conferring with Crow by telephone, Manis advised Crow that he would be coming to the Daytona Beach jail on August 11, 1982.

Manis testified that he had been keeping Dean Moxley, the assistant prosecuting attorney in Brevard County within the Eighteenth Judicial Circuit, advised of his actions and that Moxley had suggested that Manis try to talk to Stano again. Therefore Manis drove to the Daytona Beach Police Department where he spent four to five minutes with Crow in Crow's office. Manis stated that he originally went there to see when he could talk to Stano, and when he arrived Crow stated that Manis could talk to Stano "right now". Manis testified he was caught by surprise because he did not have a tape recorder, his file on the case, or even a brief case and was not prepared to talk to Stano. Nevertheless, he followed Crow to an interview room where Stano was waiting, and Crow introduced Manis to Stano. Crow gave Stano his *Miranda* rights, and Stano filled out the waiver form in the presence of Manis.[69]

Crow then asked Stano if he remembered Manis, and Stano responded "Yes". Crow left to get coffee for Manis and Stano and came back in two to three minutes. Crow asked Manis and Stano if they wanted anything else. Stano answered that he would like to go for a jog, and everyone laughed. Manis then began his interview, and Crow stood there for a few minutes before he left Manis and Stano alone for the interview.[70] Manis alone asked Stano questions. Stano discussed both the Scharf and the Dubose

68. Stano had been the target of a previous assassination plot when "Cowboy Bob", the husband of Toni Vann Haddocks, one of Stano's murder victims, had achieved entry as a prisoner into the jail where Stano was housed with intent to murder Stano. This event was also referenced in the confession of Stano to the murder of Vann Haddocks. Petitioner's 32, p. 8. Also, there was evidence that Stano had attempted suicide on one occasion. Because the trial court made Stano's safety the responsibility of the Volusia County Sheriff and the Daytona Beach Police Department, Captain Ouellette at Crow's request drafted a bulletin outlining the security measures to be taken with reference to Stano, which bulletin was posted and circulated by Captain Ouellette to jail personnel during the week of August 10, 1982. Petitioner's 38. Crow coordinated interviews of Stano by several people from different jurisdictions who wished to question Stano about unsolved homicides. Generally, Crow would introduce the investigator to Stano, stay for a few minutes to make sure there was rapport, and then leave Stano with the investigator who conducted the questioning.

69. Neither Crow nor Manis testified that the waiver of rights form was filled in before it was given to Stano. Manis testified that when Crow read Stano his rights, Stano responded verbally to each question and that Stano's responses orally were the same as those responses indicated on the waiver form. Stano signed the form. Manis also testified that the form was blank when Crow first read Stano his rights. (Petitioner's 50).

70. Manis initially testified that Crow remained there two or three minutes and then that he was there ten to twenty minutes. On being questioned concerning his testimony in a deposition of April 27, 1983 when he stated that Crow left half way through the interview, Manis stated that Crow left after the start of the interview and that he was not there for the complete interview which lasted approximately one to one and a half hours. Crow testified that after introducing Manis and Stano, Crow stayed in the room with the two men approximately ten to twenty minutes and then left.

murders with Manis.[71]  After the interview, Manis returned to Brevard County.

Manis returned from Brevard County to Crow's office at the Daytona Beach Police Department the next day on August 12, 1982 and told Crow that he wanted to record Stano's testimony.  Crow advised Manis that several other agents were waiting to interview Stano and that Stano was fairly booked for the day.  Nevertheless, Crow eventually took Manis to the interview room where Stano was waiting.  At this interview, Manis had his Scharf file, his tape recorder, his Dubose file, and a waiver of rights form.  Manis read the *Miranda* rights to Stano.  Stano waived his rights.  This is also reflected in the recording of this interview.  Petitioner's 149.[72]  Manis conducted the interview, and Crow came in and out of the room during the interview from time to time.  Crow was not there for all of the interview, nor did he ask Stano any questions during the interview.

Manis identified as a true and correct transcript of Stano's confession on August 12, 1982, an exhibit marked Respondent's 30.  This Court noted, without satisfactory explanation from counsel, that in the transcript of this interview which was provided to the appellate court in Petitioner's appendix and which was admitted into the record before this Court as Respondent's 31, that the name of Manis as the questioner in the original transcript has been eliminated and the name of Paul Crow has been inserted as the ques-

tioner in the place of Mr. Manis.  Thus, it appears that someone has tampered with this document presented to both this court and the appellate court.

The evidence is undisputed that Paul Crow did not participate by asking questions in either interview of Stano on August 11, 1982 or August 12, 1982, and that during the taped confession and interview of Stano on August 12, 1982, Manis is the only person who asked Stano questions.  (Respondent's 149).  While Crow was present very briefly during the interviews on both dates, Manis was the person conducting the questioning.[73]

During the interview on August 12, 1982, Manis took a statement from Stano concerning the Scharf murder first and then a statement concerning the Dubose murder next.  (Petitioner's 189).  The information provided by Stano concerning these confessions was given by Manis to John Dean Moxley, Jr., the Assistant State Attorney in charge of prosecuting the first degree murder cases of Scharf in Brevard County and of Dubose in Seminole County for the Eighteenth Judicial Circuit.

From a second point of view, Dean Moxley testified that he was involved in two prosecutions of Gerald Stano involving jury trials, the Scharf case prosecution in September of 1983 which resulted in a mistrial and the Scharf case prosecution in December of 1988

---

**71.**  Crow did not appear to have information on the Dubose murder.

**72.**  Manis testified that the waiver of rights form had not been filled out by Crow or anyone else before it was presented to Stano.  Similarly, Crow testified that when Manis arrived on August 12, 1982, he did not recall that a waiver of rights form had been filled out prior to the interview with Stano on that date.  The transcript of the August 12, 1982 interviews reflects that Stano stated he had been given and waived his rights on August 11, 1982 before he made his confession, and he waived his rights prior to the interview by Manis on August 12, 1982 (Respondent's 30).  Moxley testified that he had no information that Crow had filled in the *Miranda* rights form before it was read or given to Stano.

**73.**  Manis testified that he did not recall being interrupted during the taping of the Scharf con-

fession on August 12, 1982 or turning off the tape recorder.  He testified that he did not edit the tape recording.  The Court finds the testimony of Martin M. Markowitz speculative, unreliable and beyond the competency of this witness with reference to alleged electronic psychological stress analysis, intentional interruption of tape recordings of interviews with Stano in order to coerce him to confess, and his ability to monitor Stano's central nervous system by listening to the six cassette tapes in Petitioner's 149 and opine that Stano was conducting a charade and staging rehearsed, involuntary conversations to please the officers by saying what Stano knew they wanted to hear because they fed Stano information and asked Stano leading questions.  There is no dispute that Stano would admit to committing a murder and then allow a tape recording to be made at a later time of his confession.  Also, from time to time the recordings of interviews were interrupted or stopped.

which is the subject of the instant case.[74]

Sometime in 1982, Manis talked to Moxley about the letter from Crow implicating Stano in a murder in Brevard County. In April of 1982, Moxley had Crow's letter, the information from Manis and Bollick concerning their visit to the Florida State Prison when Stano stated he did not recall the Scharf incident, and certain crime scene facts that appeared to fit facts that Stano had given to Crow. Moxley decided to present the case to the grand jury in 1982 to encourage the Brevard County Sheriff to spend more time and effort investigating the case. Moxley felt that there was probable cause to indict Stano, but there was sentiment in Brevard County that since Stano was subject to incarceration for life as a result of the Volusia County cases, additional effort should not be devoted to his prosecution for a murder in Brevard County. Therefore, the presentation of information to the initial grand jury by Moxley was designed to learn if the grand jury would recommend further investigation of the case. The grand jury did recommend that the Sheriff further investigate the case.[75]

In March of 1983, Moxley made a second presentation to the Brevard County grand jury. This time he presented as witnesses officers Crow, Hudson, Manis, and Kendrick and his Brevard County State's Attorney investigator, George Dirshka. The grand jury issued an indictment as to Stano for the murder of Ms. Scharf.

Moxley testified concerning the extensive investigation that he conducted himself and directed others to conduct with reference to the prosecution of the Scharf case. For instance, he interviewed witnesses, attended two depositions of Paul Crow, and talked to many witnesses in the Maher case because

he felt that it involved similar fact evidence under the *Williams* Rule.[76] Moxley also sent investigators to other jurisdictions to examine their files in an effort to gain other similar fact evidence.

In addition, Moxley personally compared the facts contained in the confession of Stano to Manis with the crime scene and the route which Stano stated to Manis that he had taken. Moxley determined that the description of the body being covered with palm fronds was consistent with the several palm fronds placed on top of Scharf's body when she was found. Stano's statement concerning her Indian jewelry matched the ring with the Indian head that she was wearing when her body was found. Stano's statement concerning Scharf's clothing, her age, and her general description matched that of the victim.

Further, Moxley determined that Stano's statement of the circumstances of his travel and the route that he took were consistent with the details of the murder. Moxley personally drove the route given by Stano. Stano mentioned an orange grove and a canal which Moxley located as Stano had described them. In addition, since the time of the murder, the Kennedy Space Center Preserve had been established, and the highway, which formerly had been called "A1A" in 1974 at the time of the murder, was designated State Road 3 at the Kennedy Space Center in 1983 at the time Moxley drove the route. Moxley therefore obtained an old map of the area in order to check the facts concerning the route given by Stano. Moxley found that the route given by Stano in his confession in 1982 to Manis was consistent with the facts of the route as they existed in 1974 at the time of the murder although the demarcations along the route in 1983 had been renamed.[77]

---

74. Moxley was also involved in other Stano cases, the homicide of Ms. Dubose before Judge McGregor in Seminole County and the homicide of Madame X.

75. Paul Crow did not testify before this body.

76. The state court judge excluded the *Williams* rule evidence during the guilt phase of Stano's trial but allowed it in the penalty phase, and Moxley used Crow as a witness on the Maher evidence in the penalty phase of Stano's trial for the Scharf murder.

77. For instance, Moxley testified that State Road 3 was in 1974 called "A1A", the name Stano used to describe his route. Stano described a Stuckey's restaurant on the route he traveled with the victim, Ms. Scharf. Moxley located the former Stuckey's restaurant building where Stano described it as being at the time of the murder in 1974, but the building was no longer used as a Stuckey's in 1983 when Moxley retraced Stano's route.

Moxley utilized Crow as a fact witness at some proceedings which he handled in Brevard County incident to the Scharf case. At Moxley's request, as noted above, Crow testified before the second Brevard County grand jury which issued the indictment of Stano in the Scharf case. Crow was also subpoenaed to testify in both trials [78] and was deposed. While Moxley used the statement that Stano made to Crow in March of 1981 in each trial, Moxley testified that without the confessions made on August 11 and August 12, 1982 by Stano to Manis, he would not prosecute the case because, while he had probable cause for the issuance of an indictment, he did not feel that he would have proof beyond a reasonable doubt with only the statement of Stano to Crow.[79] Moxley stated that the confessions of Stano to Manis on August 11 and August 12, 1982 were the most important confessions in his prosecution of Stano for the Scharf murder.[80] Moxley testified that he did not consider the statement to Crow made by Stano in March of 1981 as the "lynch pin" of his case.

Moxley had no information that Stano had been promised life imprisonment for reveal-ing the Scharf murder, and at no time did he have to go through Paul Crow to talk to Stano.[81] Further on two occasions Stano himself confessed to Moxley that he had murdered Scharf and Dubose and offered to plead guilty to both murders in exchange for a promise of life imprisonment.[82]

(8) *RELATIONSHIP OF CROW AND GADBERRY*

The Court has been troubled with the fact that Officer Gadberry, who took credit for solving the Mary Carol Maher murder in April of 1980, did not indicate his view that Stano did not know the facts of the crime or his concern that Stano had been fed information by Crow or that Stano was factually innocent of this crime until several years later.[83] It therefore appears that a statement of facts on the relationship between Crow and Gadberry should be made.

Paul B. Crow, now Chief of the Daytona Beach Police Department, began in 1966 as a patrolman with this law enforcement agency. At the time of the initial confession by Stano in April of 1980, Crow was a sergeant in the Daytona Beach Police Department, was Gad-

78. Moxley wrote out his questions for Crow as part of his trial preparation. (Petitioner's 80–A).

79. Moxley pointed out that the statement Stano made to Crow was contained in Crow's notes on a document that had the name Bickrest at the top. (Petitioner—160, p. 1437). At the first trial in the Scharf case, Moxley presented the statement of Stano on March 12, 1981 to Sgt. Crow and the two confessions of Stano made to Detective Manis in August of 1982. That case resulted in a mistrial because of an 11 to 1 jury vote.

80. Moxley testified that in his trial preparation he wrote out his trial questions for Johnny Manis. With reference to his questions as to the August 11, 1982 waiver of rights form, he wrote a note to himself "something funny—Crow already written answer in" (Petitioner No. 78). This was during his preparation for the September 1983 trial. Moxley had no clear memory of why he had written this in the margin but testified that as part of his trial preparation he questioned Manis concerning this and that Manis verified that Stano had been given his rights and that Stano had gone over the waiver of rights form. Moxley testified that he had no information that Crow filled in the *Miranda* rights waiver form. Moxley also testified that Manis had never told him that Stano invoked his right to counsel at any time or that Crow's help was necessary to

get the confession. Moxley had listened to the tape recording of the August 12, 1982 confession and stated that the voice of the questioner on this tape recording is that of Johnny Manis. This was confirmed by Manis himself during his testimony.

81. Moxley testified that he had no knowledge of an alleged "conspiracy" between Crow, Jacobson and McMillan to get Stano to confess to crimes, that he had no knowledge that McMillan told Crow how to question Stano, that he had no knowledge Crow deprived Stano of contact with anyone, and that he had no knowledge Crow "fed" Stano details or told Stano to confess to more crimes for an insanity defense.

82. After Stano was convicted of the murder of Cathy Lee Scharf, Moxley agreed to allow Stano to plead guilty to the murder of Sandra Dubose in exchange for the waiver of the death penalty by the state in this case (Respondent's—18). It should be noted that Sgt. Crow was not involved in the Sandra Dubose case.

83. Gadberry testified that he indicated his concerns on April 1, 1980. However, this statement is contrary to the findings of the Court based on the testimony of other witnesses.

berry's supervisor on the Detective Bureau, and reported to Captain Powers.

When Officer James W. Gadberry, Jr. was asked on the witness stand whether Crow was his supervisor at the Detective Bureau at the Daytona Beach Police Department during 1980, Gadberry bristled and answered that Crow was his "unwritten" supervisor. However, both Captain Powers and Crow testified readily when asked the same question that Crow was Gadberry's supervisor and the person to whom Gadberry reported.[84]

From further evidence it appears that during the 1980's Gadberry had been reprimanded by Crow and subsequently demoted from detective to patrolman. Captain Powers had charged Sergeant Crow with the responsibility of monitoring case control systems within the police department. Crow stated that during this time he found over 100 of Gadberry's assigned cases had not been investigated by the department's required due date and had not been worked for nine to ten months. Crow had a conference with Gadberry and gave the latter two weeks to comply with the police department's procedures. After this deadline had passed, Crow reviewed Gadberry's work and found that some of the cases still had not been investigated. When he questioned Gadberry concerning these cases, Gadberry responded that he had been on vacation and had not been able to get to them. Crow investigated and found that Gadberry had not been on vacation and further found that Gadberry had left cases unattended in his desk. Crow reported the incident to Captain Powers. In addition, at approximately the same time, Gadberry was

deemed to have improperly handled the investigation of the death of a well-known sports figure, Lewis McSwain, and Crow was assigned to complete this investigation. As a result of these events, Captain Powers suspended Gadberry for one day and transferred Gadberry out of the Detective Bureau, placing him back in the patrol division.[85]

Gadberry had also been criticized for his investigation in the Donna Hensley case. The police report reflects that Hensley defended herself against Stano, received puncture wounds with a can opener and stab wounds with a knife, and that Stano tried to pour muriatic acid on her. Gadberry noted on the Hensley report that Hensley had "superficial wounds". (Petitioner's 148) When Lt. John N. Power and his partner Officer O'Brien saw Hensley in the course of their duties for the Daytona Beach Police Department, she showed them her wounds which were still oozing. They also learned in this conversation that the suspect's car, license tag and description were available to the police. These police officers then went back to the police station and contacted Gadberry to discuss the case. After determining that Gadberry was not going to take appropriate action in the case, the police officers made a request to their supervisor, Sgt. Crow, that if Gadberry was not going to conduct the investigation into the Hensley case that they wished to be assigned the Hensley case to complete the investigation. As a result of their complaint, Crow talked to Gadberry about the Hensley case.[86] Shortly thereafter, Gadberry had Stano arrested on April 1, 1980 and brought into the Daytona Beach Police Department where Stano made his first confession as noted earlier.

84. The rule excluding witnesses had been invoked in this proceeding.

85. Gadberry denied that he had problems with any of his cases. However, Captain Powers testified that Gadberry had in fact fallen behind in his investigation of approximately 100 cases and that Powers suspended Gadberry and transferred him to another division approximately two to three months after the initial interview of Stano on April 1, 1980. Powers stated that he felt the reason in part for Gadberry's poor performance was "burnout" and that Gadberry wanted to be a youth director of a church.

Gadberry resigned from the Daytona Beach Police Department in September of 1982 to become the youth director of a church in Kentucky. He was rehired as a patrolman at the Daytona Beach Police Department in June of 1983, a position which he now holds. Patrolman is viewed as a step below the detective division within the Daytona Beach Police Department.

86. Gadberry's supplemental report on the Hensley case is dated March 28, 1980. Respondent's 3.

Captain Powers observed that while Gadberry did not appear to be resentful when Powers initially directed Crow to enter the interview room with Gadberry to question Stano on April 1, 1980, and thereafter when Powers ordered both officers to accompany each other with two backup officers and Stano to see if Stano could locate the site where the Maher body had been found, Powers noticed that Gadberry became resentful toward Crow when the rumors began to flow in the Daytona Beach Police Department that Crow would be writing a book about this experience. Further, while Gadberry testified that he was not for or against the death penalty, that it did not contradict his religious beliefs, and that he held no strong views one way or the other, Captain Powers testified that Gadberry had told Powers that Gadberry was definitely opposed to the death penalty.[87]

Finally, Dean Moxley testified that on July 29, 1983 he interviewed Gadberry about the Hensley and Maher cases in the course of his trial preparation for the prosecution of Stano in the Scharf murder. Gadberry did not make any statement to Moxley to the effect that Stano was innocent, or that he questioned Crow's interview techniques, or that Crow had led Stano to the place where Mary Carol Maher's body had been found. Moxley further testified that Gadberry told him during this interview that the odor of Mary Carol Maher's body was still at the site when Gadberry and Crow visited it with Stano. Gadberry, in contrast, denied that he had ever been contacted by Moxley.

While some of these statements are not material to the issues in this case, they reflect that Gadberry's testimony conflicts in part with the testimony of several witnesses and further help to explain why Gadberry has given evidence which is in conflict with the testimony of other witnesses.

In any event, as knowledgeable and experienced police investigators testified during the evidentiary hearing before the Court, most suspects do not tell the truth the first time they are interrogated. Giving a suspect some information is a proper interrogation technique. It is not inappropriate to tell a suspect details to refresh the suspect's memory, particularly if he is confessing to many crimes, because details of a crime to a suspect can run together.

It is the finding of this Court after listening to the evidence and observing the demeanor of the witnesses, that Sgt. Crow did not feed information to Stano and thus cause Stano to confess to crimes which he did not commit as contended by Officer Gadberry.[88]

### (9) *THE PROSECUTION TEAM*

The concurring opinion on remand requests a determination whether Detective Paul Crow was "part of the prosecution team in the Scharf case" and whether he acted under the authority of the Brevard County Prosecutor, Dean Moxley. Since this Court has found that there was no collusion or coercion as alleged by Stano, the issue whether Paul Crow of the Daytona Beach Police Department in Volusia County was part of the prosecution team in a jurisdiction outside his own, that of Brevard County, may not be necessary to this opinion. However, since evidence was presented in this trial court on the issue, and the appellate court has indicated its interest, the Court enters its findings of fact as follows.

After Stano acknowledged his responsibility to the six murders within the jurisdiction of Volusia County and entered his plea of guilty in September of 1981, Stano went to prison, and the Volusia County cases were concluded. However, Stano continued to call and write a variety of persons, including but not limited to his former attorney Donald Jacobson, Kathy Kelly and Paul Crow. Donald Jacobson cautioned Stano both before and after the conclusion of the six murder

---

87. At the time of his testimony before this Court, Captain Powers was no longer working for the Daytona Beach Police Department.

88. Kenneth Friedland, one of Stano's attorneys in the Scharf case, testified that one of the defenses in this case was that Crow fed Stano information and Stano had no independent recall of the facts. This was an issue litigated in the state court proceeding.

cases in Volusia County that his agreement concerning confessing to murders in Volusia County in exchange for life imprisonment had ended on September 2, 1981 when he entered his plea of guilty, and that he should not confess to any other murders unless he first received immunity.[89]   Jacobson knew, because of Stano's confessions to him and from his own investigation, that Stano was responsible for the murders of more than the six women in Volusia County.

The murders to which Stano confessed and the factual circumstances of each often involved different law enforcement agencies and their investigations.   It is the custom among law enforcement agencies that the agency which has jurisdiction over the territory where the body of a homicide victim is found will take jurisdiction of the case for purposes of prosecution.   However, when a victim resides in and is reported missing in one jurisdiction, and the body is found within the jurisdiction of another agency, it is a common practice for the jurisdiction having responsibility for the prosecution of the murder, i.e. the jurisdiction where the body is found, to request information from other jurisdictions in the course of gathering facts and evidence concerning the case.   This is for a variety of reasons, not the least of which is to save the cost and expense of sending investigators from one jurisdiction into another jurisdiction to do work which could be easily accomplished by the jurisdiction receiving the request for information.

Therefore, if one jurisdiction is asked for information from another jurisdiction, the second jurisdiction will try to provide the information to the requesting agency.   This does not necessarily make the investigation joint.   The jurisdiction receiving the request is obtaining evidence or information in a specifically designated sphere, even though if assistance is provided to the requesting jurisdiction, persons from that other agency may be required to testify as to what was done by them when the requesting agency proceeds with the trial of the case.

The testimony was without conflict that Sgt. Crow was not part of the Brevard County prosecution team of Dean Moxley.   Moxley testified that Crow did no investigation for Moxley and that the Scharf homicide was a Brevard County case from the date on which her remains were found, January 19, 1974, until conclusion of the second trial of Stano in Brevard County in December of 1983 for her murder.   Moxley testified that Crow was not under Moxley's authority or control and that Crow had no role in developing Moxley's case for trial.   Moxley requested information from Crow as well as from many other persons, and he specifically kept his investigation and trial preparation with reference to the charges against Stano for the murder of Cathy Scharf "self-contained".   There was no jurisdictional overlap between Brevard County and either Volusia County or the Daytona Beach Police Department with reference to control or direction of the Scharf investigation.   While Moxley asked Volusia County and the Daytona Beach Police Department for information, including copies of records and witness interviews, Sgt. Crow was used by Moxley solely as a fact witness and as a source of information on other cases.[90]

Evidence was presented on the history of the Scharf murder investigation.   James A. McDonald, Jr. was the Brevard County Sheriff's Deputy called to the scene in 1974 where hunters found the body of Scharf on the Cape Kennedy Preserve inside the Brevard County line.   At the time he was not aware of a missing person's report on Scharf in Volusia County.   He undertook the investigation of the murder of this young female, including but not limited to background research, interview of witnesses, investigation of her clothing and jewelry, and investigation of missing person's reports.   He was able to identify the victim as Cathy Lee Scharf who lived in Volusia County, and McDonald contacted Lt. Ouellette of the Daytona Beach

---

89.  As noted earlier, Don Jacobson ceased his representation of Stano in November of 1981.

90.  Moxley also called law enforcement officers in other jurisdictions, such as Gainesville, Florida, to obtain information on cases they were handling in his effort to obtain similar fact evidence.

Police Department to request that representatives of this agency go the last places where Scharf had been seen and also talk to her associates to obtain any information concerning the victim.[91]

Ouellette directed Detective Susan Nix and one or two others under his supervision in the Daytona Beach Police Department to obtain this information for McDonald. McDonald testified that Nix was not an active investigator for him. He had several telephone conversations with Detective Nix, and she as well as others from the Daytona Beach Police Department helped him gather information. However, Lt. Ouellette was McDonald's primary contact at the Daytona Beach Police Department and the person with whom McDonald spoke the most at that agency.

McDonald stated that in this early stage of the investigation, the Scharf case was not considered a joint investigation between Brevard County and the Daytona Beach Police Department. The case was always a Brevard County Sheriff's case and never a joint investigation with any other agency.

In the course of attempting to gain more information concerning the Scharf murder, McDonald had his Brevard County Sheriff's crime lab make an intelligence bulletin.[92] The crime lab had no authority to determine if an investigation was joint or not. This intelligence report was a way to seek information concerning the victim, and the intelligence reports were sent to any jurisdictions that might possibly have information on the victim. When a bulletin was sent to another agency, the crime lab automatically listed in the bulletin the name of the Brevard County Sheriff's Department and the agency to

whom it was sending the bulletin as well. Thus one bulletin could be sent to many jurisdictions which might have contact with the victim, and the crime lab would caption the bulletin with the name of the Brevard County Sheriff and the name of the jurisdiction receiving the bulletin. The crime lab would insert the name of the agency to whom it was sending the bulletin so that the bulletin would be posted in that agency's offices to solicit information.

After the Scharf murder was not resolved in 1974 and 1975, the case lay dormant, and little if any further activity with reference to it occurred until Johnny Manis reactivated the investigation of the Scharf murder as a follow up to Sgt. Crow's inquiry in 1981 concerning a murder victim in Brevard County. Manis, then a Detective with the Brevard County Sheriff's Department,[93] testified that Sgt. Crow had no responsibility to gather evidence in the Scharf case and that there was no jurisdictional overlap between Brevard and Volusia Counties. Since the Scharf body was found in Brevard County, that agency had jurisdiction of the investigation of the Scharf murder. Manis testified that he did not give Sgt. Crow any information that Crow could use to question Stano concerning Scharf and that the only thing Sgt. Crow told Manis on how to question Stano was that if Stano did not like the interviewer, Stano would not talk to him.[94]

The procedures utilized by Dean Moxley and Detective Manis in investigating the Scharf case are not unlike the procedures followed in the investigation of other victims whose bodies were found in jurisdictions outside of the Daytona Beach Police Department.[95] Crow acted in large part as a con-

---

91. McDonald did not know at that time where Scharf had been murdered.

92. Petitioner's 52.

93. Mr. Manis has not worked for law enforcement since 1984.

94. Both Don Jacobson, Stano's attorney in the six cases to which he pled guilty in Volusia County, and Kenneth Friedland, Stano's attorney in the Scharf murder prosecution, echoed this observation that Stano only talked when it suited his purposes. Jacobson testified that Stano has a

complex mind, that "sometimes he would talk to me and sometimes he would not."

95. For instance, Donald Allen Denton testified as to the procedures used in the investigation of the murder of a woman, Barbara Ann Bauer, whose body was discovered in Bradford County. Denton first went to Florida State Prison and talked to Stano directly but did not obtain a confession from him concerning this murder. Later, he requested and arranged an interview of Stano through Sgt. Crow at the Daytona Beach Police Department after Stano had been transported there at Stano's request. Crow introduced Denton to Stano and then left the interview. Stano

duit or channel of information to other agencies because the Daytona Beach Police Department did not have the personnel or the resources to conduct investigations of murders in multiple jurisdictions outside its own jurisdiction.[96] While Crow did investigate the murders committed within the jurisdiction of his own Daytona Beach Police Department and to some extent assisted the investigation of murders within the jurisdiction of the Volusia County Sheriff's Department, Crow primarily passed along pieces of information Stano gave to other agencies and would try to encourage Stano to talk to representatives of other agencies about crimes in their respective jurisdictions.[97]

With reference to the questions posed in the concurring opinion as to the "prosecution team", the Court finds as follows:

1. There was no collusion between Crow, Jacobson and McMillan, and therefore by implication, and by his direct testimony, Moxley was unaware of any collusion.

2. Crow did not work for Moxley.

3. Crow was not under the control or authority of Moxley.

4. Crow had no significant role in developing the Scharf murder case for trial once he informed Manis of Stano's statement concerning a victim in Brevard County.

While as to the six murders in Volusia County which were part of Stano's plea agreement it could be said that there was a jurisdictional overlap and that Paul Crow was a member of Larry Nixon's prosecution team for the Seventh Judicial Circuit, these cases are distinguishable from the prosecution of Stano for the murder of Cathy Lee Scharf in a separate jurisdiction, Brevard County.

In the Volusia County cases, Sgt. Crow of the Daytona Beach Police Department was responsible for the Maher murder investigation, Detective Lehman of the Volusia County Sheriff's Department was responsible for the Toni Vann Haddocks' murder investigation, and Detective Hudson of the Volusia County Sheriff's Department was responsible for the murder investigations of Heard, Hamilton, Doe and Neal and also the Haddocks case when Lehman left the Sheriff's office. Nevertheless, Larry Nixon headed the prosecution team within the Seventh Judicial Circuit as to these six murders, and

---

then gave a confession concerning this Bradford County murder which Denton taped. (Respondent's 32 and 33; Court's Exhibit 1; Petitioner's 187). Denton testified that Stano gave new information which Denton did not have from his previous investigation of this murder and which Sgt. Crow had not been told. Denton stated that at no time did Crow deny access to Stano. Stano never stated that he would not talk to Denton without Crow, and Stano talked freely. Denton testified that his agency, and not the Daytona Beach Police Department, was the agency with the jurisdiction to investigate the murder of the victim found in Bradford County. Further, Denton and other Bradford County law enforcement representatives set up an interview with Stano on August 23, 1982 at the Volusia County courthouse without the assistance of Crow, during which Stano again freely confessed to this murder. Respondent's 33.

96. For instance, when Crow received a letter in July of 1982 (Respondent's 14) from an inmate listing sixteen homicides Stano may have committed in five counties in three states, Crow requested that the Florida Department of Law Enforcement conduct the investigation of the

twelve homicides alleged to have been committed in Florida.

97. A description of the role Crow played is contained in Petitioner's 176 (*See also* Petitioner's Advance Appendix Vol. III of V Tab 41), a deposition of Crow taken July 21, 1983 in the Scharf case, in which Stano's attorneys, Messrs. Russo and Friedland, explored with Crow his role in obtaining information from Stano and in passing information to investigators with jurisdiction over the homicide who could question Stano more knowledgeably than Crow. In this deposition Crow describes the number of homicides which Stano admitted committing (*Id.* at p. 14–15), how Stano did not "rubber stamp" confessions to homicides (*Id.* at p. 12), and how Stano had difficulty communicating with some people (*Id.*). Crow also gave an overview of how Stano might become confused as to the route he took or the year because of the number of murders. However, he noted Stano was usually very accurate as to clothing, jewelry, dialogue, location, and how the murder was effected. For instance, Stano confessed to the murder of two girls in Gainesville and was very accurate as to location, clothing and the means of the murder but was in error as to the year. (*Id.* at p. 23; *see also id.* at p. 30).

Sgt. Crow obtained information concerning these murders from Stano and others. Don Jacobson, Stano's attorney in these Volusia County cases, testified that he concurred that Sgt. Crow should be designated as the person to obtain information concerning these murders in Volusia County after Stano had been given immunity and a promise of life imprisonment in exchange for his plea of guilty to the murders of those victims whose bodies were disinterred in the Seventh Judicial Circuit as a result of the information Stano provided.

## BRADY CLAIM

### B. CONCLUSIONS OF LAW

The Eleventh Circuit remanded this claim to this Court for an evidentiary hearing to resolve disputed facts with respect to whether the alleged evidence of collusion and coercion was suppressed by the prosecution. From the factual findings of the Court discussed above, Stano's *Brady* [98] claim must fail.

A *Brady* violation occurs under the following circumstances: (1) the prosecution suppressed evidence; (2) the evidence suppressed was favorable to the defendant or exculpatory; and (3) the evidence suppressed was material to the issues at trial. *United States v. Burroughs*, 830 F.2d 1574, 1577–1578 (11th Cir.1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988). In the instant case, as discussed above, there was no collusion between Crow, Jacobson and McMillan. Not only was there no collusion, but also Moxley, by implication and by his own direct testimony, was unaware of any collusion. Additionally, there was no coercion imposed by Crow, Jacobson, or McMillan, together or individually, on Stano with regard to the confessions, and the confessions were not tainted. The Court finds that

there was no evidence of collusion or of coercion that could have been suppressed by the prosecution. Since the Court is unable to conclude that there was any evidence suppressed by the prosecution, there was no *Brady* violation.

Moreover, the Eleventh Circuit has determined that "*Brady* and its progeny apply to evidence possessed by a district's prosecution team, which includes both investigative and prosecutorial personnel. *Brady*, then, applies only to information possessed by the prosecutor or anyone over whom he has authority." *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir.1989), *cert. denied*, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989) (citation omitted) (quotation omitted). Crow did not work for and was not under the control or authority of Moxley and was not otherwise answerable to Moxley. Crow did not have a significant role in developing the Scharf murder case for trial once he informed Manis of Stano's statement with regard to a victim in Brevard County. Therefore, Crow was not an agent of Moxley. In the event that there was any evidence favorable to Stano's contentions with regard to Crow's activities, such evidence was not, as required by *Brady*, in the possession of the prosecution. Crow's knowledge was not imputable to Moxley. Hence, Crow was not a part or a member of the "prosecution team" [99] in the Scharf case, and *Brady* is not applicable. *See Meros*, 866 F.2d at 1309.

In the present case, there has been no violation of *Brady* since the Court finds that there was no collusion or coercion between, by, or among Crow, McMillan, and Jacobson and that Crow was not a part of the prosecution team. The evidence presented by Stano on the *Brady* claim is insufficient to support habeas relief.

---

**98.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**99.** In *United States v. Antone*, 603 F.2d 566 (5th Cir.1979), the Fifth Circuit, in dicta, discussed whether the knowledge of state investigators should be imputed to the federal prosecutor. The Fifth Circuit identified the pooling of investigative energies, extensive cooperation, and juris-

dictional overlap as factors to consider. *Cf. United States v. Goldberg*, 776 F.Supp. 513, 520 (C.D.Cal.1991) ("a state official's knowledge is properly imputed to federal authorities only when state and federal law enforcement officials extensively cooperate with each other in an investigation.").

## II. HENRY CLAIM

### A. FINDINGS OF FACT

In April of 1983, the State Attorney's office for the Eighteenth Judicial Circuit of Florida was advised that Clarence Zacke would agree to plead guilty to a charge of the second degree murder of Richard Lee Hunt and to assist the State in the prosecution of his co-defendants charged with this murder.[100] On April 15, 1983, the State Attorney, Mr. Douglas Cheshire, Jr., and others traveled to Florida State Prison to interview Zacke about becoming a witness in the Hunt murder case.[101] Zacke indicated to Cheshire that he wanted his classification changed and a reduction in his sentence.[102] After discussion, Cheshire, Joe Mitchell, Zacke's attorney, and Zacke agreed that Zacke would enter a plea of guilty to a charge of murder in the second degree of Richard Lee Hunt and receive a sixty year sentence of incarceration instead of the death penalty on this charge. In addition Zacke would receive a reduction to sixty years of incarceration on the sentence he was currently serving for other crimes, all sentences to be served concurrently. Zacke also agreed to testify against his co-defendants in the *Hunt* case.

On April 26, 1983, Mr. Dean Moxley, as Assistant State Attorney for the Eighteenth Judicial Circuit, interviewed Clarence Zacke at Florida State Prison. Only the case involving Richard Lee Hunt was discussed at this time, and nothing was discussed which related in any manner to Gerald Eugene Stano. Zacke agreed to enter the plea agreement described above [103] and was polygraphed subsequently at the Florida State Prison at the direction of Moxley. When Moxley interviewed Zacke on April 26, 1983 at the Florida State Prison, a tape recording of this conversation was made and became part of the plea agreement in the Richard Lee Hunt case.[104]

Thereafter, Zacke was returned from Florida State Prison to the Brevard County jail and put in an isolation cell called the "shower cell".[105] Zacke testified that he did not ask for this cell and that he did not know why he was put there. However, it was the same cell in which he had been placed when he was previously in the Brevard County jail. Stano was also in the Brevard County jail during this time although not in Zacke's cell.

Zacke testified that he was in the Brevard County jail for approximately three to five months and was returned to the Florida State Prison before Christmas of 1983.[106] Zacke entered his guilty plea to the murder of Richard Lee Hunt on May 13, 1983 and was sentenced in October of 1983 in that case. During the time that he was in the Brevard County jail, he was in the exercise yard approximately five times.

There is no evidence that there was any promise from Moxley or anyone else to Zacke of leniency in exchange for his testimony or information about crimes other than the murder of Richard Lee Hunt until the telephone call from Joe Mitchell, Zacke's attorney, to Moxley in the fall of 1983 described below. Until then Moxley's promises to Zacke related solely to the Hunt murder case and are embodied in the plea agreement and transcript of the interview. There is no evidence that Zacke was directed by Moxley or Cheshire or any person to get statements for the state from Stano or from any other inmate.

Further, Moxley did not direct that Zacke and Stano be put close together in the jail. When Stano was moved from the Brevard County jail and transported to the Seminole

---

100. Richard Lee Hunt was the brother of one of the assistant state attorneys in the Eighteenth Judicial Circuit.

101. The transcript of the interview is Petitioner's 86.

102. Cheshire refused Zacke's request as to designation of place of imprisonment. *Id.* at pp. 3–6.

103. Petitioner's 87 and 88; Respondent's 36 and 37. The Plea Agreement was signed in August of 1983 and filed in the official court records.

104. Petitioner's 86.

105. Respondent's 23(a) is a diagram of the area.

106. Since all other co-defendants entered pleas of guilty, Zacke was not required to testify in the Hunt murder case.

County jail on May 12, 1983 in response to an order of the state court, Moxley requested that Zacke be moved to the shower cell for his security "when Stano is moved", meaning when Stano was taken to the Seminole County jail. Respondent's 34.[107] After Zacke entered his plea of guilty in the Hunt case in Brevard County on May 13, 1983, Zacke was moved into the shower cell at the Brevard County jail. Stano was in the Seminole County jail during this time. At the time of this move, there had been no conversation between Zacke and Moxley about Mr. Stano.

On July 14, 1983, Stano's counsel caused Stano to be transferred back to the Brevard County jail from the Seminole County jail, and in this month Mr. Stano and Mr. Zacke had the conversation in the exercise yard during which Stano confessed to committing the murder of Cathy Lee Scharf.[108] Initially, Zacke did not tell anyone about Stano's confession to him because Zacke thought Stano would be convicted. After Stano's first trial resulted in a mistrial in September of 1983, Zacke told his attorney, Joe Mitchell, about Stano's confession. Mitchell then contacted Moxley to advise him that Zacke had information concerning Stano.

Moxley testified that he was completely surprised by Joe Mitchell's contact and the information he related. Moxley thereafter had Zacke polygraphed, and when the results showed that Zacke was being "non-deceptive", Moxley decided to talk to him. Zacke advised Moxley of the confession of Stano to Zacke at the exercise yard and asked to be moved from Florida State Prison and to receive the return of his seized truck.[109] Moxley interviewed Zacke again shortly before the second trial of Stano and found Zacke's statement of the exercise yard confession by Stano to be the same on this subsequent interview as it had been on Moxley's previous interview of Zacke.

Zacke testified that he provided the information to the authorities concerning Stano's confession on his own volition. Both he and Moxley testified that no one had told, suggested or advised Zacke to go back into the jail and get more information. Neither Moxley nor anyone on his behalf directed Zacke to obtain statements from Stano. There is no credible evidence to the contrary.

The testimony of Marlene Mitchell Alba concerning jail house sweeps in Brevard County, the affidavits of Curtis Davis, Sr. and Johnny Jim Mallory to the effect that snitches were used by Brevard County authorities (Petitioner's 200 and 209), and the testimony of Melvin Shackleford, Marvin Glen Cook and Lawrence Litus about rumors as to who was a "snitch" in the jail do not constitute proof of Stano's contention that Zacke had been promised leniency in exchange for testimony about other murders or that Zacke had been placed in proximity to Stano to obtain additional information for the prosecutor. None of these witnesses had any evidence concerning Mr. Zacke or Mr. Stano which supported Petitioner's contention that Zacke was a government agent. Further, the Court finds that the testimony of William Van Poyck, an inmate on death row with Stano who had been asked by Stano to help him in this case, lacks credibility and is of questionable relevancy. In any event, Van Poyck testified that Zacke never stated that he was acting as a government agent or that a person acting on behalf of the state

107. The sergeant's log for the Brevard County jail reflects that on May 12, 1983, two Brevard County officers took Stano to the Seminole County jail where he was left, and then they picked up Zacke on the same date at the Seminole County jail and returned Zacke to the Brevard County jail. Respondent's 39 lists the cells occupied in such jail by Stano and Zacke. Zacke and Stano were not housed together in the same cell.

108. This confession, the circumstance surrounding it, and the promises to Zacke for his testimony were subject to extensive cross examination in Stano's subsequent state court trial for the mur-

der of Ms. Scharf. They were also explored in the pretrial deposition of Zacke. Petitioner's 191 pp. 19–31. Kenneth Friedland, an attorney for Stano, testified that he knew of the parameters of Zacke's plea agreement with the state in the Hunt case before Stano's second trial in the Scharf case.

109. Again, the circumstances of Zacke's statements to Moxley concerning Stano's confession to Zacke and the promises made to Zacke by the state were the subject of extensive cross-examination and direct examination during the second trial of Stano.

attorney asked Zacke to get more information concerning Stano.

Moxley stated that on November 14, 1983, he wrote the Supervisor of Corrections, Louis Wainwright, to ask for the transfer of Zacke (Petitioner's 192). This was for security reasons to protect Zacke from retaliation while he was in the same prison as Stano. On December 12, 1983 he again wrote the Department of Corrections to request transfer of Zacke to another prison to prevent retaliation. (Petitioner's 193).

On October 3, 1984, Zacke's attorney, J. Robert Cooper, wrote the Parole Commission to ask for a hearing in December because he had requested Moxley to testify and relate the fact that Zacke had testified in two cases and had given important cooperation (Petitioner's 194). However, this letter to the Parole Commission was not written pursuant to any promise Moxley made to Zacke. After Stano's second state court trial, Cooper asked Moxley to make a statement to the parole commission. Moxley testified he did not see Cooper's letter and did not promise Cooper that he would make favorable comment for Zacke. Prior to the end of Stano's second trial, Moxley had made no promise that he would make a favorable comment to anyone on Zacke's testimony in the Stano case.

## HENRY CLAIM

### B. CONCLUSIONS OF LAW

Stano alleges that the testimony of Clarence Zacke relating to his jailhouse confession violates *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), because the prosecutor, Dean Moxley, promised leniency to Zacke in exchange for testimony about other murders and because Moxley directed that Zacke and Stano be placed in proximity to each other in the jail, thus making Zacke an agent of the state who elicited statements from Stano in violation of *Henry*. The evidence of record does not support these contentions, and thus the Court does not need to deal in this opinion with the issue of whether there has been procedural default.

There is no evidence that there was prearrangement for Zacke to obtain information for the authorities with reference to Stano or that he was acting in the capacity of a government agent. While Zacke confessed to his role in the murder of Richard Lee Hunt and agreed to testify against co-defendants, he had no promises of leniency except those specifically relating to the Richard Lee Hunt case, i.e. that he would receive a reduction in his current sentence from 180 years to 60 years incarceration and that he could plead guilty to second degree murder and receive a sentence of 60 years concurrent, thus eliminating the potential of the death penalty.

To establish a violation of the Sixth Amendment in a jailhouse informant case, the defendant must demonstrate that a fellow inmate was a government agent and that the inmate deliberately elicited incriminating statements from the defendant. *United States v. Henry*, 447 U.S. 264, 270, 100 S.Ct. 2183, 2186–87, 65 L.Ed.2d 115 (1980); *see also Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir.1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). The primary concern is "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1985).

In the present case, there was no evidence that Zacke received instructions from the police, from the prosecutors, or from anyone else to do anything whatsoever concerning Stano. There was nothing in the evidence presented to the Court indicating that there was any prearrangement for Zacke to obtain anything from Stano. The Court was presented with no evidence indicating that Zacke was paid or otherwise rewarded to develop any type of relationship with Stano or to otherwise secure incriminating information. The prosecution did not use Zacke to carry out any deliberate and surreptitious interrogation of Stano. Zacke was not promised any rewards for any information that he might provide regarding Stano. The prosecution did not request Zacke to elicit any information from Stano, and there was no presolicitation of Zacke by the prosecution to do anything of any nature concerning Stano.

There simply was no evidence that Zacke was a government agent or that Zacke in any manner deliberately elicited incriminating statements from Stano.

"[A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. at 2630. In the present case, Stano has merely shown that Zacke reported Stano's incriminating statements to the police. However, "we should keep in mind the duty that is imposed upon all citizens to report criminal activity to the appropriate authorities .... This deeply rooted social obligation is not diminished when the witness ... is involved in illicit activities himself .... [T]he criminal defendant no less than any other citizen is obliged to assist authorities." *Lightbourne*, 829 F.2d at 1020 (citation omitted) (quotation omitted). There is no violation of the Sixth Amendment when " 'by luck or happenstance [ ] the State obtains incriminating statements from the accused after the right to counsel has attached.' " *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. at 2630 (quoting *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985)).

"There is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the sixth amendment right to counsel .... At a minimum, however, there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." *Depree v. Thomas*, 946 F.2d 784, 793–794 (11th Cir.1991). Stano has failed to show that Zacke was acting as a government agent when he elicited incriminating statements from Stano. Zacke was not paid by, nor was he acting under the instructions or solicitations of the prosecution. "[T]he protections of the Sixth Amendment right to counsel enunciated in ... *Henry* [is] inapplicable when, after the right to counsel has attached, statements by a defendant are made to an individual who is not an agent for the Government, although he may be a Government informant. This is so regardless of whether the statements were 'deliberately elicited.' " *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir.1986), *cert. denied*, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). In the instant case, Stano has not established any Sixth Amendment violation, and there is no basis for habeas relief.

### III. JOHNSON v. MISSISSIPPI CLAIM

The Eleventh Circuit has directed this Court to address the argument that Stano's sentence should be vacated because "two of the prior convictions which were relied upon by the State in the sentencing phase were found to be invalid by a panel of this court." *See Stano v. Dugger*, 901 F.2d 898, 905 (11th Cir.1990). The Eleventh Circuit was referring to its prior opinion in *Stano v. Dugger*, 889 F.2d 962 (11th Cir.1989), in which this Court was directed to grant Stano's petition for writ of habeas corpus because of the determination that the state trial judge committed error in accepting Stano's guilty plea with regard to the murders of Susan Bickrest and Mary Kathleen Muldoon.

However, in *Stano v. Dugger*, 897 F.2d 1067 (11th Cir.1990), the Eleventh Circuit vacated the opinion reported at 889 F.2d 962 so that the cause could be reheard by the court "in banc." The Eleventh Circuit subsequently determined in *Stano v. Dugger*, 921 F.2d 1125 (11th Cir.1991), that Stano had not raised a constitutionally cognizable claim under either self-representation or ineffective assistance of counsel analysis, and "all other appellate issues presented by Stano [were referred] to the original panel for resolution." *Id.* at 1154. Hence, the decision of this Court to deny Stano habeas relief with respect to his Sixth Amendment claims was affirmed.

The Eleventh Circuit's determination that the *Johnson* [110] claim was still viable arose from its earlier determination that Stano's convictions for the murders of Bickrest and

---

**110.** *Johnson v. Mississippi*, 486 U.S. 578, 108  S.Ct. 1981, 100 L.Ed.2d 575 (1988).

Muldoon "were found to be invalid by a panel of this court." *Stano,* 901 F.2d at 905. However, the opinion invalidating those convictions was subsequently vacated by the Eleventh Circuit[111], and the Eleventh Circuit, in its opinion reported at 921 F.2d 1125, affirmed this Court's denial of Stano's request for habeas relief as to the convictions for the murders of Muldoon and of Bickrest; therefore, this Court does not need to address the argument on the *Johnson* claim since the convictions for the murders of Muldoon and of Bickrest remain valid.[112]

Therefore, this Court finds the Petitioner's claims to be without merit, including contentions which may not be specifically addressed in this opinion.[113]

DONE AND ORDERED at Orlando, Florida this 10th day of June, 1992.

/s/ Patricia C. Fawsett

PATRICIA C. FAWSETT

United States District Court

Copies furnished to:

Counsel of Record

United States Marshal

## APPENDIX B

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

## ORLANDO DIVISION

Gerald Eugene Stano, Petitioner,

v.

Robert A. Butterworth, et al., Respondents.

Case No. 87–753–CIV–ORL–19

Filed Aug. 17, 1993

### *ORDER*

This case is before the Court on Petitioner's Motion for Relief From Judgment Under Fed.R.Civ.P. 60(b) (Doc. No. 194, filed July 26, 1993).

Petitioner states that in June, 1993 a book entitled "Blind Fury" was published. According to Petitioner, the book was written by the mother of Assistant Attorney General Belle Turner and "purports to be an account of Paul Crow's genius at work in the Gerry Stano case." Petitioner describes the book as "tabloid type," "sensational," and "filled with sexual overtones." Petitioner alleges that the book was written with Paul Crow's "substantial assistance and active participation" and that Paul Crow wrote the book's forward. Petitioner requests the Court to set aside its Order of June 10, 1992 (Doc. No. 160) because of Mr. Crow's involvement with the book.

The Court finds that Petitioner's arguments are without merit. Mr. Crow at all times indicated he considered writing a book, but not until the investigation was over. The investigation is over. The fact that a book has now been published, that it focuses on Mr. Crow and that Mr. Crow wrote the forward does not require the Court to set aside the Order of June 10, 1992. There is no indication that Mr. Crow is the author of this book—only that he assisted the author and wrote the forward. The fact that Ms. Flowers, the author of the book, wrote a sensational book venerating Mr. Crow and that Mr. Crow has not yet been reported to have written a scholarly work as he testified he would like to do does not change the import of the Court's Order. Other witnesses testified at the evidentiary hearing that they planned to write books involving Mr. Stano which would be based on interviews with, and therefore the assistance of, Mr. Crow. In any event, the Court is unaware of any reason why Mr. Crow would now be foreclosed from authoring a book of his own. Whether his investigation of and

---

**111.** *See Stano v. Dugger,* 897 F.2d 1067 (11th Cir.1990).

**112.** The Court notes that Respondents have addressed the merits of the *Johnson* claim in their proposed findings of fact and conclusions of law filed with this Court. However, the Court determines that it is unnecessary to address the merits of the *Johnson* claim because of the Eleventh Circuit's opinion reported at 921 F.2d 1125 in which this Court's denial of habeas relief was affirmed.

**113.** The transcript of the proceedings before this Court had not been prepared at the time this opinion was issued by the Court.

testimony concerning Mr. Stano was tainted by his desire to write a book as well as other factors was thoroughly explored at the evidentiary hearing held in this case, and the allegations made in the instant motion demonstrate no facts which would undermine the previous findings of the Court.

Accordingly, Petitioner's Motion for Relief From Judgment Under Fed.R.Civ.P. 60(b) (Doc. No. 194, filed July 26, 1993) is DENIED.

DONE AND ORDERED in Chambers at Orlando, Florida, this 16th day of August, 1993.

/s/ Patricia C. Fawsett
PATRICIA C. FAWSETT
United States District Judge

Copies to:

pslc 8/12